

**SO ORDERED,**

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: May 8, 2020**

**The Order of the Court is set forth below. The docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**

**ON-SITE FUEL SERVICE, INC.,**                        **CASE NO. 18-04196-NPO**

**DEBTOR.**                                            **CHAPTER 7**

**MANSFIELD OIL COMPANY**                              **PLAINTIFF**
**OF GAINESVILLE, INC.**

**VS.**                                                **ADV. PROC. 19-00059-NPO**

**CAPITALA FINANCE CORP.,**                            **DEFENDANTS**
**CAPITAL SOUTH PARTNERS FUND II, LP,**
**CAPITAL SOUTH PARTNERS SBIC FUND III, LP,**
**JOHN F. MCGLINN, HARBERT MEZZANINE**
**PARTNERS III SBIC, LP, AND JOHN C.**
**HARRISON**

*CONSOLIDATED UNDER ADV. PROC. 19-00059-NPO WITH:*

**EILEEN N. SHAFFER, TRUSTEE FOR**                     **PLAINTIFF**
**THE BANKRUPTCY ESTATE OF**
**ON-SITE FUEL SERVICE, INC.**

**VS.**                                                **ADV. PROC. 20-00007-NPO**

**DIESEL DIRECT, INC., CAPITALA FINANCE CORP.;**       **DEFENDANTS**
**CAPITALSOUTH PARTNERS FUND II, L.P.;**
**CAPITALSOUTH PARTNERS SBIC FUND III, L.P.; AND**
**HARBERT MEZZANINE PARTNERS III SBIC, L.P.**

**MEMORANDUM OPINION AND ORDER ON:  (1) HARBERT
AND HARRISON'S RULES 9(b), 12(b)(7) & 12(c) MOTION
FOR JUDGMENT ON THE PLEADINGS AND (2) CAPITALA
DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

This matter came before the Court for a telephonic hearing on March 17, 2020 (the "Hearing"), on Harbert and Harrison's Rules 9(b), 12(b)(7) & 12(c) Motion for Judgment on the Pleadings (the "Harbert Motion") (Adv. Dkt. 88)[1] filed by Harbert Mezzanine Partners III, LP, f/k/a Harbert Mezzanine Partners III SBIC, LP ("Harbert") and John C. Harrison ("Harrison" or together with Harbert, the "Harbert Defendants"); Harbert and Harrison's Memorandum of Authorities in Support of their Rules 9(b), 12(b)(7) & 12(c) Motion for Judgment on the Pleadings (the "Harbert Brief") (Adv. Dkt. 89) filed by the Harbert Defendants; the Plaintiff's Response to Harbert Defendants' Rules 9(b), 12(b)(7) & 12(c) Motion for Judgment on the Pleadings (the "Mansfield Response to Harbert Motion") (Adv. Dkt. 99) filed by Mansfield Oil Company of Gainesville, Inc. ("Mansfield"); Plaintiff's Memorandum Brief in Opposition to Harbert Defendants' Rule 12 Motion (the "Mansfield Brief in Response to Harbert Motion") (Adv. Dkt. 100) filed by Mansfield; Defendants Harbert and Harrison's Rebuttal in Support of Their [88] Rules 9(b), 12(b)(7) & 12(c) Motion for Judgment on the Pleadings (the "Harbert Rebuttal") (Adv. Dkt. 104) filed by the Harbert Defendants; Capitala Defendants' Motion to Dismiss First Amended Complaint (the "Capitala Motion") (Adv. Dkt. 90) filed by Capitala Finance Corp. ("Capitala I"), Capital South Partners Fund II, LP ("Capitala II"), Capital South Partners SBIC Fund III, LP ("Capitala III" or collectively, "Capitala"), and John F. McGlinn ("McGlinn" or together with

---

[1] Citations to the record are as follows:  (1) citations to docket entries in adversary proceeding 19-00059-NPO (the "Adversary") are cited as "(Adv. Dkt. __)"; (2) citations to docket entries in the above-reverenced bankruptcy case (the "Bankruptcy Case") are cited as "(Bankr. Dkt. __)"; and (3) citations to docket entries in adversary proceeding 20-00007-NPO are cited as "(Tr. Adv. Dkt. __)".

Capitala, the "Capitala Defendants"); Capitala Defendants' Memorandum of Law in Support of Motion to Dismiss First Amended Complaint (the "Capitala Brief") (Adv. Dkt. 91) filed by the Capitala Defendants; Plaintiff's Response to Capitala Defendants' Motion to Dismiss First Amended Complaint (the "Mansfield Response to Capitala Motion") (Adv. Dkt. 101) filed by Mansfield; Plaintiff's Memorandum Brief in Opposition to Capitala Defendants' Rule 12 Motion (the "Mansfield Brief in Response to Capitala Motion") (Adv. Dkt. 102) filed by Mansfield; Capitala Defendants' Reply in Further Support of Motion to Dismiss Amended Complaint (the "Capitala Rebuttal") (Adv. Dkt. 108) filed by the Capitala Defendants in the Adversary.  The Harbert Defendants and the Capitala Defendants are referred to collectively as the "Defendants."

The Capitala Defendants attached the following two (2) exhibits to the Capitala Motion: (1) excerpts from a transcript of the trial held on the Involuntary Petition from March 11-13, 2019 in the Bankruptcy Case (Adv. Dkt. 90-1) and (2) the Memorandum Opinion and Order on Involuntary Petition Against a Non-Individual; On-Site Fuel Service, Inc.'s Answer to Involuntary Petition for Bankruptcy and Counterclaim under 11 U.S.C. § 303(i); Answer and Affirmative Defenses of Petitioning Creditors to Counterclaim under 11 U.S.C. § 303(i); and Objections to Counter-Designations of Deposition Excerpts Filed by Petitioning Creditors as to Certain Joining Creditors and Jared Prentiss [Dkt. Nos. 132-140] (the "Involuntary Petition Opinion") (Adv. Dkt. 90-2) entered in the Bankruptcy Case on May 24, 2019.  At the Hearing, E. Barney Robinson represented the Harbert Defendants; Jeffrey R. Blackwood, Clarence Webster, III, and Anthony P. La Rocco represented the Capitala Defendants; and W. Thomas McCraney, III and Douglas C. Noble represented Mansfield.

At a status conference on April 16, 2020 (the "Status Conference"), the Court announced its decisions on the Harbert Motion and the Capitala Motion from the bench and informed the

parties that a written opinion would follow.  The objective of the Court in doing so was to assist

the parties in completing the discovery process in the time available.  (Adv. Dkt. 79, 105).  This

Memorandum Opinion and Order on:  (1) Harbert and Harrison's Rules 9(b), 12(b)(7) & 12(c)

Motion for Judgment on the Pleadings and (2) Capitala Defendants' Motion to Dismiss First

Amended Complaint (the "Opinion") fulfills the commitment of the Court made at the Status

Conference by memorializing and supplementing the Court's bench rulings.

## TABLE OF CONTENTS

JURISDICTION ...............................................................................................................6

FACTUAL ALLEGATIONS .............................................................................................6

PROCEDURAL HISTORY ...............................................................................................17

DISCUSSION ....................................................................................................................21

I.      CAPITALA MOTION ..............................................................................................21

A.     Rule 12(b)(7) Dismissal .........................................................................................21

      1.     Rule 19 Standard ..........................................................................................21

      2.     Extrinsic Evidence .......................................................................................23

      3.     Rule 19(a)(1):  Necessary Party ...................................................................24

            a.     Rule 19(a)(1)(A): Complete Relief in On-Site's Absence........................24

            b.     Rule 19(a)(1)(B): Impairing On-Site's Ability to Adjudicate Claims.......28

      4.     Summary—Rule 12(b)(7) Dismissal .................................................................35

B.     Rule 12(b)(6) Dismissal .........................................................................................35

      1.     Rule 12(b)(6) Standard .................................................................................36

      2.     Extrinsic Evidence .......................................................................................37

      3.     Choice of Law ..............................................................................................38

4.  Common-Law Tort Claims ............................................................................39

  a.  Fraud and Negligent Misrepresentations .................................40

    (1)  Statement of Opinion ........................................44

    (2)  Inference of Fraudulent Intent .......................45

    (3)  Justifiable Reliance ..........................................47

    (4)  Merger Clauses ................................................49

    (5)  Summary—Fraud and Negligent Misrepresentations...................50

  b.  Tortious Interference with Contract.........................................51

  c.  Aiding and Abetting Breach of Duty .......................................53

  d.  Civil Conspiracy ......................................................................57

5.  Statutory Claim ..........................................................................................58

6.  Summary—Rule 12(b)(6) Dismissal .........................................................68

C.  Summary—Capitala Motion ...................................................................................68

II.  HARBERT MOTION ........................................................................................................68

A.  Rule 12(c) Judgment on the Pleadings....................................................................69

1.  Rule 12(c) Standard ..................................................................................69

2.  Extrinsic Evidence ....................................................................................70

3.  Choice of Law............................................................................................71

4.  Is the Complaint an impermissible "shotgun" pleading?.........................71

5.  Does the Complaint state a claim for relief?.............................................79

  a.  Fraud and Negligent Misrepresentations .................................79

    (1)  Harbert ............................................................82

    (2)  Harrison...........................................................86

(3)    Summary—Fraud and Negligent Misrepresentations...................90

    b.    Tortious Interference with Contract...........................................90

    c.    Aiding and Abetting Breach of Duty ........................................91

    d.    Civil Conspiracy .....................................................................92

    e.    Statutory Claim .......................................................................94

  6.    Summary—Rule 12(c) ...........................................................95

B.    Summary—Harbert Motion ................................................................95

CONCLUSION.................................................................................................95

## JURISDICTION

The Court finds that it has subject matter jurisdiction pursuant to 28 U.S.C. § 1334. The Adversary originally was filed as a civil action in the U.S. District Court for the Southern District of Mississippi (the "District Court") in Cause No. 3:19-CV-00587-CWR-FKB. The parties later consented to the entry of an order referring this civil action to the Bankruptcy Court pursuant to 28 U.S.C. § 157(c)(2) to facilitate coordination with the Bankruptcy Case and anticipated litigation by the chapter 7 trustee. (Adv. Dkt. 1); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015). The Court, therefore, has the authority to enter a final order and judgment on all causes of action in the First Amended Complaint (the "Complaint") (Adv. Dkt. 77). Notice of the Hearing was proper under the circumstances.

## FACTUAL ALLEGATIONS

During this preliminary stage of litigation, the relevant facts are taken from Mansfield's allegations in the Complaint. For the sake of brevity, the Court refers to them without repeatedly describing them as allegations in the Complaint. Doing so says nothing about whether Mansfield ultimately will be able to prove these allegations at trial:

*        *        *        *

**On-Site**

Before it ceased operations on October 23, 2018, On-Site Fuel Service, Inc. ("On-Site") was in the tank wagon fuel supply business.  (Adv. Dkt. 77 ¶ 13).

**Capitala & Harbert**

Capitala and Harbert are private equity firms and investment partners and together are the majority owners of On-Site Fuel Holdings, Inc. pursuant to the Subordinated Note Purchase Agreement, as amended, dated December 29, 2011 (the "Note") (Adv. Dkt. 77 ¶ 14).  On-Site Fuel Holdings, Inc. in turn owns 100% of On-Site.  (Adv. Dkt. 77 ¶ 14).  The Note designates Capitala to act as the "collateral agent" for both Capitala and Harbert as purported lenders to On-Site with respect to On-Site's assets and property pledged as collateral.  (Adv. Dkt. 77 ¶ 14).

**McGlinn & Harrison**

Capitala and Harbert managed their investment in On-Site as a joint venture by controlling On-Site's board of directors.  (Adv. Dkt. 77 ¶¶ 15-16).  On-Site's board was composed of five (5) members.  (Adv. Dkt. 77 ¶ 16).  Capitala and Harbert each had two (2) board members, and On-Site's founder, Greg Nethery, was the other board member.  (Adv. Dkt. 77 ¶ 16).  McGlinn was Capitala's primary board representative and served as chairman of the board.  McGlinn also acted as the *de facto* chief executive officer and chief financial officer of On-Site and the primary agent for the joint venture with Harbert.  (Adv. Dkt. 77 ¶ 17).  Harrison was Harbert's primary board representative.  (Adv. Dkt. 77 ¶ 18).  McGlinn and Harrison voted as one block to control the operations, finances, and strategic decisions of On-Site for the benefit of the majority owners.  (Adv. Dkt. 77 ¶ 19).

**Special Committee**

As agents for Capitala and Harbert, McGlinn and Harrison comprised a two (2)-member "Special Committee" of On-Site's board of directors, which was formed to pursue strategic options for On-Site and specifically a business relationship with Mansfield. (Adv. Dkt. 77 ¶ 20). Mansfield is a nationwide supplier of petroleum products and at this time was both a customer and fuel supplier of On-Site. (Adv. Dkt. ¶¶ 12, 21). In 2017, Mansfield and On-Site began discussions about a strategic alliance relationship whereby Mansfield would sell petroleum products directly to On-Site's customers, and On-Site would focus on the delivery side of its business. Before December 2017, Mansfield had no net credit exposure to On-Site. (Adv. Dkt. 77 ¶ 21).

Acting on behalf of On-Site, the Defendants managed and participated in the negotiations with Mansfield and ultimately persuaded Mansfield to become a strategic partner with On-Site. (Adv. Dkt. 77 ¶ 22). As the primary point of contact with Mansfield, McGlinn acted as the agent of Capitala, Harbert, and On-Site. (Adv. Dkt. 77 ¶ 22). During these discussions, the Defendants provided Mansfield with financial information about On-Site. They represented to Mansfield that On-Site was generating "Earnings Before Interest, Taxes, Depreciation and Amortization" ("EBITDA") averaging approximately $300,000.00 per month. The Defendants knew or should have known that Mansfield was relying on these representations in considering whether to form an alliance with, and to extend credit to, On-Site. (Adv. Dkt. 77 ¶ 22).

The Defendants had available to them financial and other relevant information about On-Site's true financial condition. They knew or should have known that the financial information provided to Mansfield about On-Site was materially inaccurate. They concealed that On-Site actually had lost 7%-10% of its business by the end of 2017. If Mansfield had known the truth

about On-Site's financial condition, it would not have considered an alliance with On-Site. (Adv. Dkt. 77 ¶ 23).

## SAA

On April 12, 2018, On-Site and Mansfield signed a Strategic Alliance and Acquisition Option Agreement (the "SAA") (Adv. Dkt. 77-1, Ex. 1). The SAA contemplated that Mansfield would become On-Site's exclusive fuel supplier. On-Site would continue delivering fuel to the customers, and Mansfield would pay the transportation fees. Mansfield would take over invoicing and credit management for On-Site's customers except for three (3) direct-bill customers: YRC, USF Holland, and FedEx. YRC and USF Holland would continue to receive invoices directly from On-Site but would remit their payments to a "lock box" account controlled by Mansfield. (Adv. Dkt. 77 ¶ 28). The SAA granted the parties "the right at all times to set-off sums that it owes to the other party against sums owed to it by the other party." (Adv. Dkt. 77 ¶ 29; Adv. Dkt. 77-1, Ex. 1 ¶ 30). The SAA also provided that Mansfield could suspend regular payments to On-Site if On-Site failed to satisfy any payment obligation owed to Mansfield within 10 days of the due date. (Adv. Dkt. 77 ¶ 29; Adv. Dkt. 77-1, Ex. 1 ¶ 2).

## Purchase Option

As part of the SAA, Mansfield purchased the exclusive option to acquire On-Site's tank wagon business for a pre-negotiated purchase price of $23 million in exchange for an "Acquisition Option Fee" of $1 million. If the alliance worked as anticipated, Mansfield could capture the value it helped to create by exercising its option to acquire On-Site. After the SAA went into effect, this fee was credited against the debt then owed by On-Site to Mansfield. The option expired in four (4) years, and during this time, the SAA prohibited On-Site, Capitala, and Harbert from selling or

soliciting a sale of On-Site's assets without Mansfield's consent. (Adv. Dkt. 77 ¶ 30, Ex. 1 ¶¶ 17, 21).

**PNC Bank**

Before the SAA became effective, McGlinn informed Mansfield that On-Site's primary lender, PNC Financial Services Group, Inc. ("PNC Bank"), would not consent to the contemplated arrangement without an agreement in place for On-Site to pay off its indebtedness. (Adv. Dkt. 77 ¶ 31). McGlinn, acting on behalf of On-Site and its majority owners, solicited Mansfield to provide financial assistance to pay off On-Site's loan with PNC Bank. (Adv. Dkt. 77 ¶ 32). McGlinn asked Mansfield to make four (4) cash advances of $1.2 million each for a total advance of $4.8 million to On-Site. McGlinn and Mansfield's chief financial officer, John Byrd ("Byrd"), discussed how this arrangement would affect the net amount owed to Mansfield and when On-Site would repay this debt. McGlinn represented to Byrd that after making the four (4) payments, On-Site would owe Mansfield approximately $4.8 million. (Adv. Dkt. 77 ¶ 32; Adv. Dkt. 77-2, Ex. 2). To induce Mansfield to make these payments and increase its credit exposure to On-Site, McGlinn represented that On-Site had specific assets of approximately $6 million with which On-Site would repay the debt. McGlinn assured Mansfield that these assets were valid, collectable, unencumbered, and specifically designed to "settle the account" with Mansfield within 120 days (the "Earmarked Assets").[2] (Adv. Dkt. 77 ¶ 32). McGlinn's representations were false and deceptive.

The misrepresentations made to Mansfield were intended to benefit the joint venture because neither Capitala nor Harbert was willing to invest additional funds in On-Site. (Adv. Dkt.

---

[2] Mansfield refers to these assets as Earmarked Assets although no document uses that term.

77 ¶ 33).  Acting in concert, they sought to induce Mansfield to assume this burden.  At the time, the Defendants knew or should have known that On-Site was undercapitalized and insolvent.  They also knew or should have known that On-Site had neither the ability nor the intention of repaying this debt to Mansfield.  On-Site did not use any of the Earmarked Assets to repay Mansfield but instead, when monetized, used them to pay other debts and operating expenses as directed by the Defendants.

## TPA

Relying on McGlinn's representations, Mansfield agreed to assist On-Site by paying-off PNC Bank and also agreed to move forward with the strategic alliance.  Mansfield, On-Site, and PNC Bank entered into a Tri-Party Agreement (the "TPA") on May 12, 2018 (Adv. Dkt. 77 ¶ 35; Adv. Dkt. 77-3, Ex. 3).  The TPA required On-Site to use the cash payments from Mansfield to pay-off PNC Bank within 60 days.  The TPA verified that as of April 30, 2018, the account balance owed by On-Site to Mansfield was $10,771,853.00 and the account balance owed by Mansfield to On-Site was $7,190,589.00.  (Adv. Dkt. 77 ¶ 35; Adv. Dkt. 77-3, Ex. 3 ¶ 8).

## Direct-Bill Customers

Once the TPA was signed, On-Site's customers, except for the direct-bill customers, transitioned to Mansfield, and the SAA "went live" as of May 13, 2018.  (Adv. Dkt. 77 ¶ 36).  There was a delay until August 2018 in setting up the lock box account for the direct-bill customers.  In the meantime, On-Site continued to receive payments from the direct-bill customers for deliveries of Mansfield's fuel.  As the recipient of funds that belonged to Mansfield, On-Site had a duty to remit them to Mansfield along with accurate remittance instructions.  In June 2018, Mansfield paid On-Site four (4) cash payments of $1.2 million, and On-Site paid-off the PNC Bank loan.  (Adv. Dkt. 77 ¶ 37).

In an internal email dated June 14, 2018, On-Site's controller, Alicia Wiggington ("Wiggington"), informed On-Site's executive team that she was "worried about cash flow for next week" and asked if McGlinn would "consider pushing some money in." (Adv. Dkt. 77 ¶ 38; Adv. Dkt. 77-4, Ex. 4). Capitala and Harbert refused to "push" additional capital into On-Site because they knew the undisclosed truth about On-Site's financial condition.

The day after the internal email from Wiggington, McGlinn sent a follow-up email to Byrd confirming that On-Site owed Mansfield the net amount of approximately $4.7 million. (Adv. Dkt. 77 ¶ 39; Adv. Dkt. 77-5, Ex. 5). McGlinn assured Byrd that On-Site still had Earmarked Assets of approximately $7 million with which to repay its debt to Mansfield. (Adv. Dkt. 77 ¶ 39; Adv. Dkt. 77-5, Ex. 5). These representations were false and deceptive.

After the SAA went "live" on May 13, 2018, On-Site began misappropriating payments from the direct-bill customers and using these payments as an interest-free source of capital to fund its operations. In an internal email exchange between Wiggington and On-Site's executive team dated August 17, 2018, Wiggington asked whether money recently received from direct-bill customers should be sent to Mansfield. On-Site's president, Jared Prentiss ("Prentiss"), responded: "technically this is [Mansfield's] money," but "we have a fiduciary responsibility to ensure [On-Site has] the needed monies to fund the business." (Adv. Dkt. 77 ¶ 41; Adv. Dkt. 77-6, Ex. 6). To conceal this practice, On-Site stopped transmitting fuel data on the direct-bill customers' transactions to Mansfield.

The lock-box account was established to receive payments from the direct-bill customers on July 31, 2018, and Mansfield began to receive direct-bill payments into the lock-box account on August 22, 2018. (Adv. Dkt. 77 ¶ 43). On August 20, 2018, Wiggington sent an eighteen (18)-month cash forecast (July 2018 through December 2019) to On-Site's executive team. In the

accompanying email, Wiggington expressed concern that, without access to the direct-bill payments, On-Site would run out of operating cash in approximately six to eight weeks.  (Adv. Dkt. 77 ¶ 44; Adv. Dkt. 77-7, Ex. 7).

**Traverse**

At the majority owners' direction, On-Site engaged Traverse Financial Consulting, LLC ("Traverse") to review On-Site's financial situation and formulate a model to "wind-down" the debt owed to Mansfield.  Traverse confirmed that On-Site owed Mansfield approximately $5.8 million as of August 31, 2018.  (Adv. Dkt. 77 ¶ 44).

Beginning June 2018, On-Site provided "wind down" and "burn down" reports to update Mansfield as to the net amount owed.   (Adv. Dkt. 77 ¶ 45).   In these reports and in contemporaneous discussions, the Defendants continued to represent falsely to Mansfield that On-Site had Earmarked Assets to repay the debt within the 120-day period.  (Adv. Dkt. 77 ¶ 45). Ultimately, On-Site made downward adjustments to reflect negative EBITDA performance of 2017 and 2018 years.  Before those adjustments first were disclosed in October 2018, McGlinn and other On-Site executives repeatedly misrepresented On-Site's EBITDA performance.  (Adv. Dkt. 77 ¶ 45).

In early September 2018, On-Site used Mansfield's funds to buy two (2) new trucks for approximately $600,000.00.  (Adv. Dkt. 77 ¶ 46).  In an email exchange dated September 5, 2018, On-Site's executive team discussed withholding a payment from Mansfield in order to purchase these trucks.  (Adv. Dkt. 77 ¶ 46; Adv. Dkt. 77-8, Ex. 8).

**Default**

As of September 15, 2018, On-Site was in default on its obligation to pay-off the debt to Mansfield within 120 days of the effective date of the SAA.  (Adv. Dkt. 77 ¶ 47).  Meanwhile, On-

Site executives were continuing to misrepresent to Mansfield that On-Site was still generating positive EBITDA from operations.

Mansfield eventually became concerned that something was amiss with the direct-bill customer payments.  (Adv. Dkt. 77 ¶ 48).  Mansfield confronted Prentiss about the direct-bill customer payments and demanded an accounting.  Prentiss confessed that On-Site treated pre-lock box payments as "fungible cash" instead of sending them to Mansfield.

**October 4, 2018 Meeting**

On October 4, 2018, representatives of On-Site, including McGlinn, and Mansfield met to discuss On-Site's debt and restated financial reports.  (Adv. Dkt. 77 ¶ 49).  During this meeting, On-Site presented an "Executive Touchpoint" slide presentation that revealed the truth about On-Site's dire financial condition for the first time, specifically, that On-Site had experienced a seven percent (7%) drop in fuel sales volume starting in late 2017 and that its EBITDA performance had been grossly misrepresented.

Byrd received a full set of the Executive Touchpoint slides on October 8, 2018.  (Adv. Dkt. 77 ¶ 50).  The Executive Touchpoint contained  a slide titled "Mansfield Burn Down Plan Update." This slide was based on a reconciliation performed by Traverse and detailed the "evolution" of On-Site's debt from May 1 to September 15, 2018.  This slide showed that, according to "OFS Numbers," the net amount owed to Mansfield had not changed materially since May 2018 and was approximately $5.89 million.  McGlinn was informed of and agreed with this calculation.

Byrd was alarmed by information in the slides indicating that On-Site could not fund operations, would not generate positive cash flow until at least April 2019, and would require at least $600,000 in working capital in addition to regular operating income from Mansfield.  (Adv. Dkt. 77 ¶ 51).  Even with regular payments from Mansfield, On-Site was insolvent and projected

to go deeper into the hole. Equally troubling to Byrd was his realization that On-Site had been using Mansfield's money as an unsecured credit source to fund operations and purchase new equipment.

Following the October 4, 2018 meeting, representatives of On-Site and Mansfield had ongoing discussions about reconciling the direct-bill customer transactions and possible work-out scenarios to preserve the relationship. (Adv. Dkt. 77 ¶ 52). To prevent On-Site's debt from continuing to grow, Mansfield exercised its contractual right to set-off and suspend further payments to On-Site on October 11, 2018.

**Traverse Report**

McGlinn provided Mansfield with a copy of an internal report prepared by Traverse that analyzed On-Site's financial condition through August 31, 2018 (the "Traverse Report") (Adv. Dkt. 77 ¶ 53). Consistent with the Executive Touchpoint, the Traverse Report concluded that as of August 31, 2018, On-Site owed Mansfield approximately $5.8 million.

The Traverse Report contained additional, previously undisclosed information about On-Site's financial condition. (Adv. Dkt. 77 ¶ 54). It included a disturbing "observation" that for the past twenty (20) months, On-Site had not generated "sufficient cash flow to (i) service its truck and equipment loans, (ii) pay cash interest, (iii) fund capital expenditures, and (iv) absorb non-operating expenses." (Adv. Dkt. 77 ¶ 54). The Traverse Report also showed that On-Site had negative "free cash flow" of $7.9 million during the past twenty (20) months and had negative cash flow from operations for the period from January through August 2018 of $1.4 million. (Adv. Dkt. 77 ¶ 54).

**October 19, 2018 Meeting**

Representatives of Mansfield and On-Site had a follow-up meeting on October 19, 2018. McGlinn did not attend this meeting.  (Adv. Dkt. 77 ¶ 55).  During this meeting, Mansfield proposed to continue the relationship and resume regular payments to On-Site if Capitala would agree to pay interest on On-Site's debt and also guarantee that the net amount of the debt would not increase by funding any cash shortages as On-Site continued to operate.  At that time, the parties agreed the net amount of the debt owed by On-Site to Mansfield was approximately $6 million.  No definitive agreement was reached at this meeting because Mansfield's proposal had to be approved by the Defendants.

**October 22, 2018 Meeting**

Representatives of Mansfield and On-Site met again on October 22, 2018.  (Adv. Dkt. 77 ¶ 56).  McGlinn attended this meeting.  During this meeting, McGlinn informed Mansfield that Capitala and Harbert were unwilling to infuse any additional cash to fund On-Site's operations. Defendants instead wanted Mansfield to fund On-Site's operations while continuing to defer any repayment of On-Site's debt indefinitely.  In follow-up discussions with Byrd, McGlinn revealed that instead of using the Earmarked Assets to repay Mansfield as previously represented, these resources were needed and would be used to fund On-Site's operations.  McGlinn advised Byrd that unless Mansfield resumed regular payments, On-Site would be shut down and Mansfield would "have a big write-off."  (Adv. Dkt. 77 ¶ 56).

**Ceasing Operations**

The next day, October 23, 2018, On-Site emailed a letter to customers stating it would not remain in business and also terminated all of its employees except for a "skeleton crew."  (Adv.

Dkt. 77 ¶ 57).  As of that date, On-Site no longer had any viable business.  Acting in concert, the Defendants decided to cease On-Site's operations.

**Solicitations**

On October 25, 2018, On-Site disseminated a letter that advised prospective purchasers it was ceasing operations and soliciting offers for its assts.  (Adv. Dkt. 77 ¶ 58; Adv. Dkt. 77-9, Ex. 9).  This letter represented that On-Site's operating assets (excluding the Earmarked Assets) had an appraised value of approximately $7 million, $4 million of which were unencumbered.  (Adv. Dkt. 77 ¶ 58; Adv. Dkt. 77-9, Ex. 9).

**Fire Sale**

After learning that On-Site was attempting to sell its assets without Mansfield's consent in violation of the SAA, Mansfield filed a chapter 7 involuntary petition (the "Involuntary Petition") (Bankr. Dkt. 1) against On-Site on October 30, 2018.  (Adv. Dkt. 77 ¶ 59).  The next day, October 31, 2018, On-Site hastily closed a "fire sale" of its assets to Diesel Direct, Inc. at a below-market price.  (Adv. Dkt. 77 ¶ 60).  The Defendants did not use any of the proceeds from the "fire sale" to pay the debt owed to Mansfield.  On-Site currently owes Mansfield an unpaid debt of at least $6 million.  The Defendants' bad faith actions sabotaged the alliance and Mansfield's ability to collect On-Site's debt.  (Adv. Dkt. 77 ¶ 60).  This paragraph concludes the summary of allegations contained in the Complaint.

*     *     *     *

**PROCEDURAL HISTORY**

**Bankruptcy Order for Relief**

The Involuntary Petition was contested and litigated for several months concluding in a three-day trial in March 2019 and closing arguments on April 3, 2019.  On May 24, 2019, the

Court entered an Order for Relief, and Stephen Smith was appointed the chapter 7 trustee.  (Adv. Dkt. 77 ¶ 61; Bankr. Dkt. 159).  On July 30, 2019, On-Site filed its bankruptcy schedules through its designated representative, McGlinn, acting in his capacity as On-Site's chairman of the board. (Bankr. Dkt. 229).  On-Site disclosed "Claims for breach of contract and related torts against Mansfield Oil Company" in the amount of $23 million.  (Bankr. Dkt. 229 at 22).  On-Site listed Capitala as having a total claim of $18,237,136.95 secured by "All assets of Debtor."  (Bankr. Dkt. 229 at 27-28).  On-site listed Harbert as having a claim of $12,355,099.18 also secured by "All assets of Debtor." (Bankr. Dkt. 229 at 29).  On-Site listed Mansfield as having a non-priority, unsecured claim of $6,982,343.02 for "fuel purchase" and $520,329.52 for "DEF/administrative fuel." (Bankr. Dkt. 229 at 109).  In the schedules, On-Site discloses that it terminated the SAA on October 31, 2019 "due to Mansfield's breach."  (Bankr. Dkt. 229 at 128).  On September 13, 2019, Stephen Smith resigned as the chapter 7 trustee, and he was replaced by Eileen N. Shaffer (the "Trustee").  (Bankr. Dkt. 256).

Capitala and Harbert filed proofs of claim 49, 50, 51 and 54 (Claim #49-51, 54) for a total secured debt of $17,044,999.85 in principal, plus accrued interest and fees for "Money loaned" pursuant to the Note.  Mansfield filed proof of claim 53 (Claim #53) for an unsecured debt of $8,748,767.51 for "Fuel sold, breach of contract, conversion."  McGlinn and Harrison filed nearly identical proofs of claim, 52 and 55, respectively (Claim #52, #53), in an indeterminate amount for indemnification and contribution "related to the Adversary . . . and/or any future claims asserted . . . relating to his service as a member of [On-Site]'s board of directors."

**Adversary**

This action was originally filed in the District Court and was referred by the District Court to this Court on December 16, 2019 with the consent of the parties.  (Adv. Dkt. 1).  In the

Complaint, Mansfield requests entry of a judgment against the Defendants, jointly and severally, for compensatory and punitive damages under common-law claims of fraud, negligent misrepresentation, tortious interference with contract, aiding and abetting, and civil conspiracy. (Adv. Dkt. 77 ¶¶ 62-84 ).  Mansfield also seeks treble damages under North Carolina's Unfair and Deceptive Trade Practices Act ("NC UDTPA"),[3] N.C. Gen. Stat. § 75-1.1.  (Adv. Dkt. 77 ¶¶ 85-90).  Mansfield attached nine (9) exhibits to the Complaint (Adv. Dkt. 77-1 to 77-9, Exs. 1-9), including the SAA (Adv. Dkt. 77-1, Ex. 1), the TPA (Adv. Dkt. 77-3, Ex. 3), and a letter dated October 25, 2018 signed by Prentiss (Adv. Dk. 77-9, Ex. 9).  The remaining six (6) exhibits consist of emails dated from May 1, 2018 to September 5, 2018, from McGlinn (Adv. Dkt. 77-2, Ex. 2); Wiggington (Adv. Dkt. 77-4, Ex. 4); Byrd and McGlinn (Adv. Dkt. 77-5, Ex. 5); Wiggington and Prentiss (Adv. Dkt. 77-6, Ex. 6); Wiggington (Adv. Dkt. 77-7, Ex. 7); and (Wiggington and Kevin French ("French") (Adv. Dkt. 77-8, Ex. 8).

The Harbert Defendants filed the Joint Answer and Defenses to [77] First Amended Complaint (the "Harbert Answer") (Adv. Dkt. 82) on January 27, 2020.  They attached as an exhibit to the Harbert Answer the Stockholders Agreement among On-Site Fuel Holdings, Inc. and Certain Stockholders of the Company Designated Herein (the "Stockholders Agreement") (Adv. Dkt. 82 at 28-59).  The Harbert Defendants filed the Harbert Motion and the Harbert Brief on January 29, 2020.  They seek dismissal of all claims against them under Rule 12(b)(7) of the Federal Rules of Civil Procedure ("Rule 12(b)(7)")[4] for failure to join an indispensable party or,

---

[3] The Court refers to N.C. GEN. STAT. § 75-1.1 as the Unfair and Deceptive Trade Practices Act although the North Carolina General Assembly amended the statute to delete the word "trade." *Marshall v. Miller*, 276 S.E.2d 397, 401 & n.1 (N.C. 1981).

[4] Rule 12(b) is made applicable to adversary proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure.

in the alternative, a judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)").[5]  Mansfield filed the Mansfield Response to Harbert Motion and the Mansfield Brief in Response to Harbert Motion on February 20, 2020.  Harbert filed the Harbert Rebuttal on March 3, 2020.

The Capitala Defendants filed the Capitala Motion and the Capitala Brief on January 29, 2020.  They seek dismissal of all claims against them under Rule 12(b)(7) for failure to join an indispensable party and under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") for failure to state a claim upon which relief can be granted.  Mansfield filed the Mansfield Response to Capitala Motion and the Mansfield Brief in Response to Capitala Motion on February 20, 2020.  The Capitala Defendants filed the Capitala Rebuttal on March 5, 2020.

**Trustee's Adversary**

On February 3, 2020, the Trustee commenced a separate adversary against Diesel Direct, Inc., Capitala I, Capitala II, Capitala III, and Harbert (the "Trustee's Adversary") (Adv. Proc. 20-00007-NPO) by filing the Adversary Complaint (Tr. Adv. Dkt. 1).  The Trustee filed the First Amended Complaint (Tr. Adv. Dkt. 27) on March 2, 2020.  The Trustee seeks to subordinate the secured claims purportedly held by Capitala and Harbert and to avoid the "fire sale" of On-Site's assets to Diesel Direct, Inc.  Because the Trustee's Adversary shares common questions of fact and law, the Court ordered the consolidation of the Trustee's Adversary with this Adversary for discovery and trial purposes pursuant to Rule 42 of the Federal Rules of Civil Procedure ("Rule 42").[6]  (Adv. Dkt. 105).

---

[5] Rule 12(c) is made applicable to adversary proceedings by Rule 7012 of the Federal Rules of Civil Procedure.

[6] Rule 42 is made applicable to adversary proceedings by Rule 7042 of the Federal Rules of Bankruptcy Procedure.

DISCUSSION[7]

Collectively, the Defendants move to dismiss all claims. The Court considers the Capitala Motion and the Harbert Motion separately.

## I.        CAPITALA MOTION

In the Capitala Motion, the Capitala Defendants seek dismissal of all claims asserted against them under Rule 12(b)(7) for failure to join On-Site as a necessary and indispensable party under Rule 19 of the Federal Rules of Civil Procedure ("Rule 19")[8] and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The Court considers the joinder issue first because if Mansfield has failed to join an indispensable party, the Court may not need to address their other arguments.

### A.       Rule 12(b)(7) Dismissal

The Capitala Defendants contend that On-Site played a critical role in the events and transactions underlying the allegations in the Complaint and, therefore, the Adversary cannot proceed in its absence. In the Harbert Brief, the Harbert Defendants adopt by reference the "arguments and authorities" asserted by the Capitala Defendants under Rule 12(b)(7). (Adv. Dkt. 89 at 26-27). The Court thus addresses the joinder issue for all Defendants here.

#### 1.       Rule 19 Standard

Federal law controls the question of joinder. *Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 125 n.22 (1968). Where state law causes of action are asserted, however, a court may look to state law in determining whether an outside party has a sufficient interest in

---

[7] The following findings of fact and conclusions of law are made pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[8] Rule 19 is made applicable to adversary proceedings by Rule 7019 of the Federal Rules of Bankruptcy Procedure.

the litigation to require joinder.  *Doré Energy Corp. v. Prospective Inv. & Trading Co.*, 570 F.3d 219, 231 (5th Cir. 2009).

Under federal law, consideration of a motion to dismiss for failure to join an indispensable party begins with Rule 19.  The structure of Rule 19 requires a two-step inquiry.  First, Rule 19(a) provides that certain persons are required to be joined, if feasible.  Second, Rule 19(b) provides that if joinder is not feasible, the court must decide whether litigation should proceed without the absent party.  If the absent party should be joined under Rule 19(a) and suit cannot proceed among the existing parties under the requirements of Rule 19(b), the case must be dismissed under Rule 12(b)(7).  The purpose of compulsory joinder is to "bring all persons that may have an interest in the subject of an action together in one forum so that the lawsuit may be fairly and completely disposed of."  *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1308 (5th Cir. 1986).

The party advocating joinder has the initial burden of demonstrating that a missing party is necessary to the litigation.  *Hood ex rel. Miss. v. City of Memphis*, 570 F.3d 625, 628 (5th Cir. 2009).  The burden shifts to the party opposing joinder if the court's initial consideration of the facts indicates the absence of a possibly necessary party.  *Id.*

Under Rule 19(a)(1), a person or entity is a necessary party if:

(A)    in that person's absence, the court cannot accord complete relief among existing parties; or

(B)    that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

   (i)    as a practical matter impair or impede the person's ability to protect the interest; or

   (ii)    leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

FED. R. CIV. P. 19(a)(1).[9]  Rule 19(b) then provides the framework for determining whether the action should proceed without the absent party or should be dismissed under Rule 12(b)(7).  To prevail under Rule 12(b)(7), therefore, the Defendants must show that:  (1) On-Site is a necessary party, (2) On-Site's joinder is not feasible, and (3) in On-Site's absence, the Adversary cannot proceed in equity and in good conscience.

Deciding whether an entity is a necessary and indispensable party is "a highly-practical, fact-based endeavor."  *Deyarmett v. Antero Res. Corp.*, No. 1:17CV86-LG-RHW, 2017 WL 2218312, at *3 (S.D. Miss. May 19, 2017).  "The decision has to made in terms of the general policies of avoiding multiple litigation, providing the parties with complete and effective relief in a single action, and protecting the absent persons from the possible prejudicial effect of deciding the case without them."  *Zenith Ins. Co. v. Tex. Inst. for Surgery, LLP*, No. 3:18-CV-0182-D, 2018 WL 5297754, at *4 (N.D. Tex. Oct. 25, 2018) (quoting 7 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 1604 (3d ed. 2018)).

### 2.     Extrinsic Evidence

In ruling on a motion to dismiss for lack of joinder of an indispensable party, the Court may consider extrinsic evidence outside the pleadings.  *Deyarmett*, 2017 WL 2218312, at *2.  In support of their Rule 12(b)(7) motion, the Defendants cite testimony from a trial on the Involuntary Petition held from March 11-13, 2019 in the Bankruptcy Case.  A full transcript of that three-day trial, consisting of six hundred (600) pages, is available on the docket in the Bankruptcy Case (the

---

[9] After the 2007 amendments, Rule 19 no longer uses the term "necessary" to define those who should be joined or the term "indispensable" to define those who must be joined, but as made clear by the Advisory Committee's note, the change from "necessary" to "required" and the omission of the term "indispensable" were "intended to be stylistic only."  FED. R. CIV. P. 19 advisory committee's note to 2007 amendment; *see Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008) (noting the changes to Rule 19).  Thus, the labels "necessary" and "indispensable" remain useful as a shorthand description of the analysis required by Rule 19.

"Trial Transcript") (Bankr. Dkt. 238, 239, 240).  The Capitala Defendants attached only ten (10) pages of the Trial Transcript to the Capitala Motion.  (Adv. Dkt. 90-1).  Mansfield contends that the Court cannot in fairness consider these excerpts without permitting Mansfield "an opportunity to present a more complete record" but has not designated which additional pages of the Trial Transcript the Court should consider.  (Adv. Dkt. 102 at 5).  The Capitala Defendants do not oppose Mansfield's request (Adv. Dkt. 108 at 2 n.1), but in the absence of any designation by Mansfield, the Court declines to review the six hundred (600)-page Trial Transcript on its own. The Court, therefore, considers only the excerpts cited by the Capitala Defendants in support of their Rule 12(b)(7) argument, which includes only two pages of the Trial Transcript and consists solely of the testimony of Byrd under direct examination by Mansfield's counsel.  The Court presided over the trial on the Involuntary Petition and heard Byrd's testimony in its entirety, thus mitigating Mansfield's concerns of any mischaracterization of his testimony by the Defendants.

### 3.      Rule 19(a)(1):  Necessary Party

The Defendants argue that On-Site is a necessary and indispensable party under: (1) Rule 19(a)(1)(A) because the Court cannot grant complete relief among the existing parties without On-Site and (2) Rule 19(a)(1)(B) because disposing of this action in On-Site's absence will impair On-Site's ability to adjudicate claims against Mansfield and would leave the Defendants vulnerable to inconsistent obligations.

### a.      Rule 19(a)(1)(A):  Complete Relief in On-Site's Absence

Rule 19(a)(1)(A) provides that a "person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party" if complete relief among the existing parties cannot be accorded in that person's absence.  The Defendants describe the Adversary as arising out of Mansfield's contractual dealings with On-Site

and contend that On-Site is a necessary party because any injuries suffered by Mansfield were caused solely by On-Site's alleged breach of the SAA and the TPA. They point to the proof of claim filed by Mansfield in the Bankruptcy Case in the amount of approximately $9 million as evidence of On-Site's liability. Unlike On-Site, however, none of the Defendants was a party to either the SAA or the TPA, and none guaranteed On-Site's performance. The Defendants cite Byrd's testimony regarding Mansfield and On-Site's on-going business relationship before the strategic alliance where Mansfield sometimes hired On-Site to deliver fuel to Mansfield's customers, and On-Site sometimes purchased fuel from Mansfield. (Adv. Dkt. 90-1 at 4-5). Although Mansfield communicated with McGlinn about forming an alliance with On-Site as alleged in the Complaint, the Defendants assert that those communications were made by McGlinn while acting solely as On-Site's chairman of the board. According to the Defendants, all damages claimed by Mansfield arose solely out of Mansfield's business relationship with On-Site and the conduct of On-Site and/or individuals acting on On-Site's behalf.

The Defendants emphasize that On-Site, as a separate corporate entity, is liable for its own debts and torts. *See W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 67 (5th Cir. 1994) ("The fundamental concept of corporate law is that the corporation is a wholly separate, legal entity."). They admit that Mansfield has not asked this Court to hold them vicariously liable for On-Site's conduct but insist that Mansfield's claims, in essence, are predicated on that theory. For that reason, they claim that the Adversary cannot proceed without On-Site, the central figure in Mansfield's story. They cite *Freeman v. Northwest Acceptance Corp.*, 754 F.2d 553, 559 (5th Cir. 1985), where the Fifth Circuit Court of Appeals dismissed an action brought against the corporate parent not for its own acts but for the acts of its subsidiary under a theory of vicarious liability because the subsidiary was not joined as an indispensable party.

Mansfield disputes the Defendants' characterization of the Complaint as alleging claims that arise solely from "contractual dealings" between Mansfield and On-Site.[10]  Mansfield admits that On-Site's failed business is featured prominently in the Complaint but asserts that the Complaint alleges independent common-law tort claims as well as a statutory claim against the Defendants.  Mansfield refers to On-Site as a joint tortfeasor and cites *Bedel v. Thompson*, 103 F.R.D. 78 (S.D. Ohio 1984), for the general proposition that a joint tortfeasor is a permissible, rather than a necessary party under Rule 19.

In *Bedel*, the plaintiffs sued the former directors of a securities firm and others for alleged violations of the federal securities law.  *Id*. at 79.  The plaintiffs did not name the securities firm as a defendant because it had commenced a chapter 11 bankruptcy case.  A defendant moved to dismiss the lawsuit under Rule 19.  The *Bedel* court found that the securities firm was not necessary to provide "complete relief" as contemplated under Rule 19(a) because there was joint and several liability between and among the existing defendants to the action.  *Id.* at 80-81.  The *Bedel* court cited the Advisory Committee's notes to Rule 19, which provide that "a tortfeasor with the usual joint-and-several liability is merely a permissible party to an action against another with like liability."  *Id*. at 80.

Mansfield also relies on the Eighth Circuit Court of Appeals' decision in *Stone's Pharmacy, Inc. v. Pharmacy Accounting Management, Inc.*, 875 F.2d 665 (8th Cir. 1989).  There, the primary contracting party filed bankruptcy and an action for tortious interference with contract against the non-contracting parties ensued.

It is clear that [the debtor] is not a necessary party to the tort claim.  Although the claim arose out of the sale of [the debtor's] assets to [the defendant], there is no

---

[10] Mansfield does not contend that On-Site functioned as an *alter ego* of the Defendants, and, therefore, does not attempt to merge the identities of the Defendants with On-Site for the purposes of its Rule 19(a) analysis.

> need for [the debtor] to be involved in the action. Any potential liability on the part
> of [the debtor] for breach of contract is irrelevant to this claim. The fact that [the
> debtor] failed to perform the contract is simply an element of proof which [the
> plaintiff] has the burden of showing.

*Id*. at 668.

Mansfield alleges claims for fraud, negligent misrepresentations, tortious interference with contract, aiding and abetting breach of duty, and civil conspiracy as well as a statutory claim for unfair and deceptive trade practices. Neither the Defendants nor Mansfield examines each claim individually to determine whether On-Site is a required party. Because they are all tort claims, the parties apparently agree that the same analysis under Rule 19 applies to all.

The Court recognizes the long-standing principle of tort liability that the liability of joint tortfeasors is joint and several, and that a plaintiff may sue one or more joint tortfeasors without joining the others. *See Lynch v. Johns-Manville Sales Corp*., 710 F.2d 1194, 1198 (6th Cir. 1983) ("It is beyond peradventure that joint tortfeasors are not indispensable parties in the federal forum."). If Mansfield prevails, Mansfield will be accorded complete relief without On-Site because the Defendants will be jointly and severally liable for the damages incurred by Mansfield. *Helix Inv. Mgmt., LP v. Privilege Direct Corp.*, 364 F. Supp. 3d 1343, 1352 (M.D. Fla. 2019) ("Where only money damages are sought, a court can grant complete relief despite an absent party because 'money is fungible; the recipient cares not from whence it came'."). Moreover, "[j]ust as in the closely related case of joint tortfeasors, there is no rule that you cannot sue the interferer without also suing the party to your contract whom the defendant inveigled into breaking the contract." *Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V.*, 391 F.3d 871, 880 (7th Cir. 2004) (distinguishing between an indispensable party and an indispensable witness); *see Sykes v. Hengel*, 220 F.R.D. 593, 598 (S.D. Iowa 2004) (party to contract not necessary party in action

based on tortious conduct, including tortious interference with the contract, despite existence of separate pending breach of contract action against non-party).

By arguing that On-Site is responsible for its own torts as a separate corporate entity and citing case law where the plaintiff's claims are based on the vicarious liability of the absent party, the Defendants ignore the nature of Mansfield's claims. Mansfield does not attempt to hold any of the Defendants vicariously liable for On-Site's conduct. Moreover, the suggestion that On-Site may owe indemnity obligations to McGlinn or Harrison does not render On-Site a necessary party. The ability to accord complete relief under Rule 19(a)(1)(A) "relates to those persons already parties and does not concern any subsequent relief via contribution or indemnification for which the absent party might later be responsible." *Bedel*, 103 F.R.D. at 80 (citing *Morgan Guar. Tr. Co. of N.Y. v. Martin*, 466 F.2d 593 (7th Cir. 1972)); *see Morgan v. Kobrin Sec., Inc.*, 649 F. Supp. 1023, 1031 (N.D. Ill. 1986) (noting that if the debtor were required to indemnify, that would affect only the obligations of the debtor, not the existing defendants).

Rule 19 is not the proper mechanism for determining the viability of Mansfield's claims but is designed merely to evaluate whether a non-party impedes the Court's ability to "accord complete relief among existing parties." For the above reasons, the Court finds that Mansfield can obtain complete relief from the existing Defendants without On-Site. The Court next considers whether On-Site is a necessary party under Rule 19(a)(1)(B) because of possible prejudice to On-Site.

### b.    Rule 19(a)(1)(B):  Impairing On-Site's Ability to Adjudicate Claims

Rule 19(a)(1)(B) requires that a "person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction" must be joined if that person "claims an interest relating to the subject of the action" and if adjudicating the action without that

person either impairs the person's ability to protect its interest or leaves the existing parties subject to a risk of incurring double, multiple, or otherwise inconsistent obligations.  The Court considers first whether On-Site "claims an interest relating to the subject of the action."  *See Sylve v. Searail, Inc.*, No. 85-5787, 1987 WL 8445, at *2 (E.D. La. Mar. 26, 1987) (holding that a party has an "interest" in the subject of the action if the outcome might detrimentally affect a party's ability to defend any subsequent litigation).

According to the Defendants, Mansfield tacitly admits that On-Site claims an interest in the Adversary in the jurisdictional paragraph of the Complaint where Mansfield alleges that "the outcome of this case could conceivably 'relate to' a Chapter 7 proceeding pending in this Court" as grounds for subject matter jurisdiction under 28 U.S.C. § 1334.  (Adv. Dkt. 77 ¶ 9).  Under 28 U.S.C. § 1334(b), district courts are granted "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  The district courts assign cases to the bankruptcy courts by way of referral.[11]  As explained by the Fifth Circuit, "related to" is a term of art.  "A proceeding is 'related to' a bankruptcy if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."  *Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 585 (5th Cir. 1999).  The precise effect need not be established with certainty:  "jurisdiction will attach on a finding of any conceivable effect."  *Id.*  For example, "related to" jurisdiction exists when a creditor's claim against a non-debtor potentially could reduce the amount of its claim against the bankruptcy estate.  *Id.* at 586.  Likewise, if Mansfield recovers damages against the non-debtor Defendants in the

---

[11] Usually, cases are assigned automatically pursuant to local rules.  *See, e.g.*, S.D. MISS. CIV. R. 83.6.

Adversary, such an outcome conceivably could "relate to" the Bankruptcy Case by reducing the amount of Mansfield's claim against On-Site.

The Court finds that while the potential for reducing claims against On-Site's bankruptcy estate provides a basis for federal subject matter jurisdiction, it does not establish that On-Site has an "interest" in the Adversary for purposes of Rule 19(a)(1)(B). The analysis under Rule 19(a)(1)(B) differs, and the Defendants do not cite any authority that has equated a finding of "related to" jurisdiction under 28 U.S.C. § 1334(b) with compulsory joinder.

Beyond the jurisdictional paragraph of the Complaint, the Defendants contend that On-Site is an interested party for two additional reasons. First, they allege that On-Site has an obligation under Mississippi law to indemnify its officers and directors, including McGlinn and Harrison, for its acts. *See* MISS. CODE ANN. § 79-4-8.52 (awarding corporate director indemnification for reasonable expenses). Second, they maintain that the Adversary exposes On-Site to a risk of adverse rulings that could be used against On-Site in other litigation against Mansfield.

To be a required party under Rule 19(a)(1)(B) because of an interest in the subject matter of the action, however, On-Site must assert its own interest. *Colbert v. First NBC Bank*, No. 13-3043, 2014 WL 1329834, at *3 (E.D. La. Mar. 31, 2014). The district court in *Helix* ruled accordingly in a similar situation:

> Helix urges the Court not to dismiss the entire complaint in favor of an interest that the bankruptcy trustee is aware of and has not asserted. In support, Helix cites cases illustrating the general reluctance of courts to join a non-party for purposes of protecting a non-party's interest when the non-party itself has not claimed an interest in the outcome. These cases reinforce the policy that the plaintiff is the master of its own claim.

*Helix*, 364 F. Supp. 3d at 1352 (citations omitted). As the Defendants point out, all claims that On-Site may hold against Mansfield are now property of the bankruptcy estate, subject to the exclusive control of the Trustee. 11 U.S.C. § 541(a)(1). Among the Trustee's statutory duties, the

Trustee must evaluate On-Site's claims against Mansfield and prosecute them if she determines that doing so would maximize the value of the estate. 11 U.S.C. § 704(a)(1). The Trustee is aware of the Adversary but has not attempted to intervene to assert an interest in Mansfield's tort claims against the non-debtor Defendants or to bring any tort or contract claim against Mansfield.

On February 3, 2020, the Trustee commenced the Trustee's Adversary against Capitala, Harbert, and Diesel Direct, Inc. (Tr. Adv. Dkt. 1). The Trustee seeks to subordinate the purported secured claims of Capitala and Harbert and to avoid the "fire sale" of On-Site's assets to Diesel Direct, Inc. As grounds for relief, the Trustee alleges the following:

> Acting at the behest of Capitala and Harbert, McGlinn and Harrison directly participated in inequitable conduct which harmed On-Site and/or targeted Mansfield, an On-Site creditor. Capitala and Harbert authorized, directed, approved or acquiesced in the conduct of McGlinn and Harrison. In the alternative, Capitala and Harbert are vicariously liable for the inequitable conduct of McGlinn and Harrison which was committed for the purpose of benefitting Capitala and Harbert and furthering the interests of the Capitala-Harbert joint venture.

(Tr. Adv. Dkt. 27 ¶ 55). These allegations mirror those in Mansfield's Complaint and suggest no wrongdoing by Mansfield.

The Defendants argue that *Helix* and *Colbert* are factually distinguishable because in each case the debtor's lack of interest was undisputed. In *Helix*, the debtor's bankruptcy schedules did not disclose an interest in the assets that were the subject of litigation, *Helix*, 364 F. Supp. 3d at 1352, and in *Colbert*, the dispute involved two secured creditors regarding which one of them held a superior security interest in the debtor's collateral, *Colbert*, 2014 WL 1329834, at *1. The Defendants point out that On-Site disclosed in its bankruptcy schedules "Claims for breach of contract and related torts against Mansfield Oil Company" estimated at $23 million. (Bankr. Dkt. 229 at 22). Notwithstanding the bankruptcy schedules, the Trustee's lack of interest in pursuing a claim against Mansfield does not appear to be disputed.

As a preliminary matter, the Court notes that McGlinn signed the bankruptcy schedules because On-Site had no employees remaining when the Order for Relief was entered in the Bankruptcy Case. (Bankr. Dkt. 229 at 1). McGlinn's alleged role in the purported fraudulent scheme casts doubt as to whether he included the $23 million claim against Mansfield in the schedules in his capacity as On-Site's board chairman or in some other capacity. More important, Capitala III, acting as the designated collateral agent for both Capitala and Harbert, recently filed in the Bankruptcy Case the CapitalSouth Partners SBIC Fund III, LLP Motion for Derivative Standing to Assert Estate Claims against Mansfield Oil Company of Gainesville, Inc. (the "Derivative Standing Motion") (Bankr. Dkt. 320), in which Capitala III acknowledged the Trustee's lack of interest in suing Mansfield. The Court denied the Derivative Standing Motion from the bench at a hearing held on April 16, 2020, and later issued an order memorializing and supplementing its decision. (Bankr. Dkt. 330). The Derivative Standing Motion is discussed briefly because among the issues addressed in that contested matter was the Trustee's perspective of the Adversary.

In the Derivative Standing Motion, Capitala III sought authorization to assert claims allegedly held by the bankruptcy estate against Mansfield for breach of the SAA, torts arising out of Mansfield's "wrongful acts . . . giving rise to the Estate's contract claims," and preference claims under chapter 5 of the Bankruptcy Code. (Bankr. Dkt. 320 at 1). With respect to the contract claims, Capitala III alleged that Mansfield breached the SAA by: (1) failing to drive new customer volume to On-Site; (2) impairing On-Site's recovery of "pre-SAA" accounts receivable because of invoicing errors; (3) ceasing all payments to On-Site in October 2018; and (4) soliciting On-Site's customers. (Bankr. Dkt. 320 at 1-2). Capitala III further alleged that On-Site may have tort claims "for, among other things, breach of fiduciary duty, tortious breach of contract, conversion,

and tortious interference" but does not disclose their legal or factual basis. (Bankr. Dkt. 320 at 2). At the hearing held on April 16, 2020, counsel for Capitala III described the breach of fiduciary duty as arising out of Mansfield's control over On-Site as part of the strategic alliance. Also, at that hearing, Capitala III withdrew its request for derivative standing to pursue preference claims against Mansfield.

One factor in determining whether a creditor should be granted derivative standing to file suit on behalf of a chapter 7 trustee is whether the chapter 7 trustee has refused unjustifiably to pursue the claim. *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988). In attempting to establish this factor, Capitala III asserted in the Derivative Standing Motion that:

> The Claims could be brought instead by the Chapter 7 Trustee, but there is no indication the Trustee intends to do so. [Capitala III] has discussed the Claims with the Trustee and her counsel on several occasions. To date, however, the Trustee has declined to pursue the Claims or make a proposal to [Capitala III] in this regard.

(Bankr. Dkt. 320 at 15). In the Trustee Eileen N. Shaffer's Response to Motion by CapitalSouth Partners SBIC Fund III, LP for Derivative Standing to Assert Estate Claims Against Mansfield Oil Company of Gainesville, Inc. (the "Trustee's Response") (Bankr. Dkt. 326), the Trustee stated that "the proposition of bringing the contract claims" against Mansfield was discussed with Capitala III but that the Trustee verbally refused based on the position that such claims lacked merit. (Bankr. Dkt. 326 at 2). The Trustee asserted that no provision in the SAA expressly or impliedly imposed an obligation on Mansfield to provide On-Site with new or additional customer volume. The Trustee questioned whether the SAA imposed any obligation on Mansfield to invoice for fuel deliveries that occurred before the effective date of the SAA, but even assuming it did, the Trustee contended that the SAA apparently limited Mansfield's obligations to those customers that received petroleum products specifically supplied by Mansfield. As to the cessation of payments to On-Site in October 2018, the Trustee cited McGlinn's previous testimony that Mansfield acted

within its contractual rights under the SAA.  (Bankr. Dkt. 326 at 6).  Finally, with respect to Mansfield's alleged solicitation of On-Site's customers, the Trustee rejected Capitala III's assumption that On-Site's customers would have been serviced by Diesel Direct, Inc. in the absence of the alleged breach.

The Trustee did not state any position on the purported tort claims in the Trustee's Response because Capitala III did not disclose their factual or legal basis.  Because the Trustee continued to investigate chapter 5 claims, including those that may exist against Mansfield, the Trustee opposed standing as to any preference claims.  In summary, the Trustee did not oppose the standing of Capitala III, "[s]ubject to approval of the Court," to pursue some of the contract claims "however unlikely the chance of success" but did oppose the standing of Capitala III to assert any tort or preference claims.  (Bankr. Dkt. 326 at 14).  At the hearing on April 16, 2016, the Trustee did not argue against Capitala III's standing to pursue any such tort claims against Mansfield as long as any recovery by Capitala III would inure to the benefit of the estate and any litigation expenses would be borne initially by Capitala III.

The Trustee's failure to intervene in the Adversary, the assertions of the Trustee in the Trustee's Response, and Capitala III's own allegations in the Derivative Standing Motion demonstrate that the Trustee has no interest in pursuing any claims against Mansfield.  Even if the Trustee had asserted an interest, the Court disagrees with the Defendants that proceeding without On-Site could expose On-Site to a risk of adverse rulings.  The Defendants argue that the Trustee may face collateral estoppel as a defense because the alleged relationship between the Defendants and On-Site may be sufficiently close for this Court to find that they are "in privity."  *See Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1174 (5th Cir. 1992) (discussing the flexible concept of "privity" for issue preclusion); *Maxwell v. U.S. Bank Nat'l Ass'n*, 544 F. App'x 470, 473 (5th Cir.

2013); *In re Wilcher*, 56 B.R. 428, 435-36 (Bankr. N.D. Ill. 1985). The Court addressed the concerns about the preclusive effect of rulings or duplicative proceedings by ordering the consolidation of the Trustee's Adversary and this Adversary pursuant to Rule 42. *See Canion*, 196 F.3d at 586 (noting that where related litigation is proceeding before the bankruptcy court and the district court, consolidation and transfer of one to the other is appropriate); *Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortg. Co.)*, 471 F.3d 977, 988 (9th Cir. 2006) (consolidation of adversary proceedings was proper because the same alleged fraudulent enterprise was the basis for the borrower's claims and the trustee's claim for subordination). Thus, the Defendants have not shown that the failure to join On-Site would prejudice the estate.

### 4.      Summary—Rule 12(b)(7)

The Court finds that On-Site is not a required party under either Rule 19(a)(1)(A) or (1)(B). Mansfield can obtain complete relief from the existing parties without On-Site, and the Trustee has not claimed an interest in the Adversary. Even if the Trustee had claimed such an interest, the Defendants have not met their burden of proving prejudice to On-Site. These findings render it unnecessary for the Court to reach the question whether On-Site is an indispensable party under Rule 19(b). They also result in the denial of the Defendants' request that the Complaint be dismissed under Rule 12(b)(7) for failure to join an indispensable party.

## B.      Rule 12(b)(6) Dismissal

The Capitala Defendants argue that Mansfield's claims for fraud, negligent misrepresentation, tortious interference with contract, aiding and abetting, and civil conspiracy fail to state a claim for relief and should be dismissed pursuant to Rule 12(b)(6).

1.      **Rule 12(b)(6) Standard**

Under Rule 8 of the Federal Rules of Civil Procedure ("Rule 8"),[12] a complaint must include a statement of the claim "showing that the pleader is entitled to relief."  FED. R. CIV. P. 8. In considering a motion to dismiss under Rule 12(b)(6) for failure to properly state a claim, a complaint must be liberally construed in favor of the plaintiff and all well-pleaded facts must be taken as true.  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] judge must accept as true all of the factual allegations contained in the complaint."). Nevertheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id*. at 679.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id*. at 678.  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id*. at 679.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678.  The determination of "whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its own judicial experience and common sense."  *Id*. at 679.  The plausibility standard, however, does not give courts license to look behind the allegations and independently assess the likelihood that the plaintiff will be able to prove them at trial.  *Papin*

---

[12] Rule 8 is made applicable to adversary proceedings by Rule 7008 of the Federal Rules of Bankruptcy Procedure.

*v. Univ. Miss. Med. Ctr.*, 347 F. Supp. 3d 274, 277 (S.D. Miss. 2018). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555.

### 2.    Extrinsic Evidence

A court's review of a motion to dismiss under Rule 12(b)(6) ordinarily is limited to the contents of "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019). A court also may take judicial notice of matters of public record. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019). If other materials are presented and considered by the court, then pursuant to Rule 12(d) of the Federal Rules of Civil Procedure ("Rule 12(d)"),[13] the motion must be converted to one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure ("Rule 56").[14] *See* FED. R. CIV. P. 12(d); *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 783 (5th Cir. 2007).

As mentioned previously, the Capitala Defendants attached two (2) exhibits to the Capitala Motion, excerpts from the Trial Transcript (Adv. Dkt. 90-1 at 1-10) and the Involuntary Petition Order (Adv. Dkt. 90-2 at 1-28). As additional support for their Rule 12(b)(6) motion, the Capitala

---

[13] Rule 12(d) is made applicable to adversary proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure.

[14] Rule 56 is made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure.

Defendants also refer to the Stockholders Agreement attached by the Harbert Defendants as an exhibit to the Harbert Answer.  (Adv. Dkt. 91 at 3 n.1).

The parties do not dispute that the Court may take judicial notice of the Involuntary Petition Order.  Mansfield, however, objects to the Court's consideration of the Stockholders Agreement and the excerpts from the Trial Transcript because of a potential Rule 12(d) problem.  Mansfield also questions the authenticity of the Stockholders Agreement.

The Court finds that the Complaint does not mention either the Stockholders Agreement or testimony from the trial of the Involuntary Petition and are not central or integral to the Complaint.  *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").  Moreover, the Stockholders Agreement has not been property authenticated.  Accordingly, the Court will not consider these documents in adjudicating the Capitala Defendants' Rule 12(b)(6) motion.  The excerpts from the Trial Transcript in particular are better suited for a summary judgment determination under Rule 56.

### 3.    Choice of Law

With the exception of Mansfield's NC UDTPA claim, the parties cite Mississippi law without engaging in any choice of law analysis.  On-Site is a Mississippi corporation with its principal place of business in Mississippi.  (Adv. Dkt. 77 ¶ 13).  Mississippi is also where On-Site's business failed.  For these reasons, the parties do not dispute Mississippi's interest in this litigation.  Mansfield, however, asserts that North Carolina also has an interest because Capitala is organized in North Carolina, McGlinn resides in North Carolina, the place of the conduct causing Mansfield's injury is North Carolina, the joint venture through which the Defendants controlled

On-Site's business was centered in North Carolina, and McGlinn's communications were sent to Mansfield from North Carolina. (Adv. Dkt. 77 ¶¶ 2-6, 15). The parties agree that Mississippi law applies to its common-law tort claims but disagree as to whether North Carolina law applies to its statutory claim for unfair and deceptive trade practices.

Under Mississippi's conflict-of-laws rules,[15] the Court first must decide whether there is a "true conflict" between the laws of two states with an interest in the litigation. *S.C. Ins. Co. v. Keymon*, 974 So. 2d 226, 230 (Miss. 2008). No party contends that a "true conflict" exists between the laws of Mississippi and North Carolina with regard to Mansfield's common-law tort claims for fraudulent inducement, negligent misrepresentations, tortious interference with contract, aiding and abetting breach of duty, and civil conspiracy. (Adv. Dkt. 102 at 7). The Court, therefore, determines the pleading adequacy of Mansfield's common-law tort claims under Mississippi law as briefed by the parties. Because a true conflict exists between the laws of Mississippi and North Carolina with respect to Mansfield's unfair and deceptive trade practices claim, the Court considers the application of North Carolina law in its discussion of the NC UDTPA.

### 4.    Common-Law Tort Claims

The Capitala Defendants argue that the allegations in the Complaint are insufficient to state a claim for fraud and negligent misrepresentation, tortious interference with contract, aiding and abetting, and civil conspiracy.

---

[15] In the Fifth Circuit, it is an open question whether courts exercising bankruptcy jurisdiction should apply federal choice-of-law rules or those of the forum state (here, Mississippi). Under either approach, federal or Mississippi, the choice-of-law analysis would look to the *Second Restatement of Conflicts of Law*. *Fishback Nursery, Inc. v. PNC Bank, N.A.*, 920 F.3d 932, 935-36 (5th Cir. 2019).

### a.       Fraud and Negligent Misrepresentations

Mansfield alleges in the Complaint that the Defendants fraudulently induced it to enter into an alliance with and extend credit to On-Site.  In Mississippi, a fraud claim entails the following elements:  (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.  *Joan Cravens, Inc. v. Deas Constr. Inc.*, 1:15-CV-385-KS-MTP, 2016 WL 6997508, at *3 (S.D. Miss. Nov. 30, 2016) (citing *Holland v. Peoples Bank & Tr. Co.*, 3 So. 3d 94, 100 (Miss. 2008)).  "A claim of fraudulent inducement is simply a fraudulent misrepresentation made to include an innocent party to enter into a contract, and the same elements must be shown."  *Id.* (citing *Lacy v Morrison*, 906 So. 2d 126, 129 (Miss. 2004)).  Moreover, the plaintiff must allege that the defendant entered into the agreement with the present intent not to perform.  *Haywood v. Tribeca Lending Corp.*, 2:06CV108-P-A, 2007 WL 2237290, at *4 (N.D. Miss. July 31, 2007), *aff'd*, 307 F. App'x 869 (5th Cir. 2009) ("Fraudulent representations upon which a party may predicate any demand for relief must relate to past or presently existing facts, as facts, and cannot consist of promises, except in some cases when a contractual promise is made with the undisclosed present intention of not performing it.").

In addition to its fraud claim, Mansfield asserts a claim for negligent misrepresentations.  The elements of a negligent misrepresentation claim are similar to a fraud claim.  Whereas the defrauder knows the falsity of his statement or has not bothered to ascertain whether his statement is truthful, the negligent speaker fails to exercise reasonable care in conjunction with his representation.  *Berkline Corp. v. Bank of Miss.*, 453 So. 2d 699, 702 (Miss. 1984).  "In order to

recover on a negligent misrepresentation theory, the plaintiff must prove by a preponderance of the evidence: (1) a misrepresentation or omission of a fact; (2) that the representation is material or significant; (3) that the party charged failed to exercise the degree of diligence and expertise the public is entitled to expect of such parties; (4) that he reasonably relied on the misrepresentation or omission; and (5) that he suffered damages as a direct and proximate result of such reasonable reliance." *R.C. Constr. Co. v. Nat'l Office Sys., Inc.*, 622 So. 2d 1253, 1256 (Miss. 1993). A "[m]isrepresentation of a fact must concern a past or present fact rather than a promise of future conduct." *Id.* The third element distinguishes negligent misrepresentation from fraud. The Mississippi Supreme Court has explained the difference, as follows:

> The basis for damages resulting from negligent misrepresentation is the lack of care; the basis for damages resulting from fraud is the want of honesty. *See Restatement of the Law of Torts (Second)* sections 549 and 552 (1977). The lack of care in negligent misrepresentation and the want of honesty in fraudulent misrepresentation in business transactions give rise to distinct causes of action, the one in tort, the other in fraud.

*Bank of Shaw v. Posey*, 573 So. 2d 1355, 1360 (Miss. 1990) (citation & quotation omitted).

Before considering the allegations of the Complaint, the Court notes that in addition to the general pleading standard set by Rule 8, Mansfield's claims for fraud and negligent misrepresentation must meet the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9").[16] *Benchmark Elecs. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003) (applying Rule 9(b) to negligent misrepresentation claims "when the parties have not urged a separate focus" and the fraud and negligent misrepresentations claims are based on the same set of alleged facts)*; Harlow v. Friendship Med. Clinic, LLC*, No. 3:15-cv-00160-MPM-SAA, 2016 WL 9130982, at *2 (N.D. Miss. Apr. 28, 2016). "In alleging fraud or mistake, a party

---

[16] Rule 9 applies to adversary proceedings pursuant to Rule 7009 of the Federal Rules of Bankruptcy Procedure.

must state with particularity the circumstances constituting fraud or mistake" although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Pleading fraud with particularity requires "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997) (observing that "[a] complaint can be long-winded, even prolix, without pleading particularity" and that "a garrulous style is not an uncommon mask for an absence of detail").

In the Complaint, Mansfield alleges that the Defendants' fraudulent scheme began in late 2017 when they presented Mansfield with certain records and information concerning On-Site's financial performance as part of their discussions about forming an alliance. Mansfield claims that McGlinn and Harrison knew during this time that Capitala and Harbert did not intend to infuse any additional money into On-Site. The goal of their purported scheme was to shift On-Site's need for operating capital from PNC Bank to Mansfield. (Adv. Dkt. 77 ¶¶ 22, 24, 33, 38, 54, 64-67). According to Mansfield, the Defendants sought to achieve that goal by deceiving Mansfield into believing that On-Site was a viable business capable of paying its debts. In that regard, Mansfield alleges that the records provided by McGlinn to Mansfield were later restated to reflect negative earnings for 2017. (Adv. Dkt. 77 ¶ 45).

Mansfield contends that McGlinn took the lead on behalf of On-Site's Special Committee in pursuing an alliance with Mansfield. Mansfield describes McGlinn as wearing several different hats during this period; he was an officer and director of Capitala, the chairman of On-Site's board of directors, and the *de facto* chief executive officer and chief financial officer of On-Site. (Adv. Dkt. 77 ¶¶ 17, 20). The Defendants represented to Mansfield that On-Site was generating EBITDA

averaging approximately $300,000 per month when, according to Mansfield, they knew or should have known that On-Site was not generating sufficient cash flow to sustain regular operations.

Their purported scheme was almost derailed when PNC Bank informed McGlinn that it would not consent to the alliance with Mansfield unless On-Site paid off its indebtedness.  On-Site, however, lacked the funds to pay-off PNC Bank, and Capitala and Harbert allegedly were unwilling to "push" any more money into On-Site.  To solve this problem, Mansfield alleges that McGlinn asked it to advance On-Site $4.8 million.  To allay any concerns about its credit exposure, McGlinn informed Byrd in an email sent from his Capitala account that after making four (4) payments of $1.2 million each, On-Site would owe Mansfield approximately $4.8 million and that On-Site had "other cash inflows" of more than $6 million with which to repay this debt over the next several months.  (Adv. Dkt. 77 ¶ 32; Adv. Dkt. 77-2, Ex. 2).  Mansfield contends that at this time the Defendants knew that the "cash in-flows" were doubtful as to amount and collectability and that On-Site was too cash-strapped to use any of its collections to repay Mansfield.

In another email dated June 15, 2018, McGlinn wrote that the net amount owed by On-Site to Mansfield at that time was approximately $4.7 million and informed Byrd that On-Site had "about $7MM of working capital items to liquidate to paydown the $4.8MM due."  (Adv. Dkt. 77-5, Ex. 5).  Mansfield asserts that in reliance on these allegedly false representations, it continued to extend credit to On-Site and On-Site's debt grew to approximately $6 million.  According to Mansfield, as of September 15, 2018, On-Site was in default of its obligation to repay Mansfield within 120 days of the effective date of the SAA.  Mansfield also claims that no "cash inflows" or "working capital" items were ever used to repay Mansfield because On-Site used all collections as "fungible cash" to stay afloat.  (Adv. Dkt. 77 ¶¶ 48, 56; Adv. Dkt. 77-2, Ex. 2; Adv. Dkt. 77-5, Ex. 5).

In support of their Rule 12(b)(6) motion, the Capitala Defendants contend that: (1) McGlinn's statement in the June 15, 2018 email amounted to an opinion which is not actionable for fraud; (2) the Complaint does not give rise to an inference of fraudulent intent that is at least as compelling as an opposing inference of non-fraudulent intent; (3) the allegations do not show that Mansfield had the right to rely upon McGlinn's statements or that Mansfield's reliance was reasonable; and (4) that the SAA and TPA contain merger clauses and neither agreement required On-Site to preserve any specific assets as Mansfield's collateral. The Court addresses each argument separately below.

### (1)     Statement of Opinion

The Capitala Defendants contend that McGlinn's statement in the June 15, 2018 email to Byrd that On-Site had approximately $7 million in assets with which to repay its debt to Mansfield was merely his opinion about the value of On-Site's assets and On-Site's ability to collect its accounts receivable. Thus, the Capitala Defendants argue that as an expression of opinion, McGlinn's statement is not actionable for fraud under Mississippi law. *See Thompson v. Nationwide Mut. Ins. Co*., 971 F. Supp. 242, 243 (N.D. Miss. 1997).

In emails dated May 1, 2018 and June 15, 2018, McGlinn conveyed to Byrd that specific "cash in-flows" and "working capital items" totaling $7 million were available to repay On-Site's debt. Considering the context in which these alleged statements were made, the Court rejects the Capitala Defendants' characterization of them as opinions. McGlinn made these specific assertions about existing, ascertainable facts of which he purportedly had special knowledge given his position as chairman of On-Site's board of directors. *Vincent v. Corbitt*, 47 So. 641, 642 (Miss. 1908) ("If a person makes a positive and unqualified false statement of a fact which is susceptible of knowledge, an affirmation of knowledge is implied from the positive character of the statement,

and, if he has no knowledge, he is guilty of fraud."); *see Kidd v. Kidd*, 49 So. 2d 824, 827 (Miss. 1951) ("The fact that statements relate to the future will not preclude liability for fraud if such statements were intended and accepted as representations of fact and involved a matter peculiarly within the speaker's knowledge, or as to which he professed to have special knowledge.").

### (2)     Inference of Fraudulent Intent

The Capitala Defendants next argue that the facts alleged in the Complaint do not give rise to an inference of fraudulent intent that is at least as compelling as any opposing inference of non-fraudulent intent.  (Adv. Dkt. 91 at 17).  The Capitala Defendants assert that rather than drawing the inference that they intended to dupe Mansfield, it is more plausible that On-Site was forced to use the funds on hand to pay its day-to-day expenses because of a downturn in the national economy in the summer of 2018.  For this reason, the Capitala Defendants contend that the allegations of fraudulent intent fail to satisfy Rule 9(b).

Rule 9(b) requires that a party alleging fraud "state with particularity the circumstances constituting fraud," but the second sentence relaxes the particularity requirement by allowing a party to allege "[m]alice, intent, knowledge, and other conditions of a person's mind . . . generally." FED. R. CIV. P. 9(b).  There is a split among the Circuit Courts as to the level of generality that is sufficient under Rule 9(b) to plead fraudulent intent.  The Capitala Defendants cite *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 428, 440 (Bankr. S.D.N.Y. 2016), for the proposition that Rule 9(b) requires a plaintiff asserting fraud to allege facts that give rise to a "strong inference" of fraudulent intent.  There, the plaintiff alleged claims of intentional fraudulent transfer.  In reviewing the standard under Rule 9(b) for pleading fraudulent intent, the bankruptcy court cited decisions from the Second Circuit Court of Appeals holding that a plaintiff asserting a fraud claim must allege facts that give rise to a "strong inference" by alleging either:  (1) facts

showing that the defendant had both motive and opportunity to commit fraud or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness.  *Id*. at 440 n.55-56 (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006); *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).  In addition, the New York bankruptcy court in *Lyondell* cited the U.S. Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), which set the standard for evaluating allegations of scienter in actions brought under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77z-1 *et seq*.

In *Tellabs*, the U.S. Supreme Court noted that Congress adopted the PSLRA to heighten the pleading requirements for securities fraud in recognition that private securities lawsuits "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."  *Tellabs*, 551 U.S. at 313.  As set forth in the PSLRA, a plaintiff must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).  Congress did not define the key term "strong inference" in the statute.  In *Tellabs*, the U.S. Supreme Court  interpreted "strong inference" as requiring an inference of scienter to be "more than merely plausible or reasonable— it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs*, 551 U.S. at 314.  The Capitala Defendants' argument is based on the U.S. Supreme Court's statutory interpretation of "strong inference" and the Second Circuit's use of that heightened pleading standard in evaluating common-law fraud claims.

The U.S. Supreme Court's analysis in *Tellabs* does not apply here because Mansfield does not allege a securities fraud claim for which a heightened pleading standard beyond Rule 9(b) is mandated by statute.  Moreover, the Second Circuit has adopted the most stringent of the pleading

requirements for fraudulent intent, which differs from the standard for fraudulent intent set by the Fifth Circuit. The Fifth Circuit has made it clear that a "simple allegation that a defendant had fraudulent intent" is insufficient. *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (citation omitted). Even though the second sentence of Rule 9(b) relaxes the particularity requirement for conditions of the mind, such as intent, a plaintiff must allege specific facts supporting an inference of fraud. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008). The Fifth Circuit's pleading standard under Rule 9(b) does not require a court to weigh the inference urged by the plaintiff against all "plausible, nonculpable explanations for the defendant's conduct" to determine which is more likely. *Tellabs*, 551 U.S. at 324. Facts that show a motive to commit fraud or that identify circumstances that indicate conscious behavior on the part of the defendant are sufficient. Because the Capitala Defendants do not dispute that the allegations in the Complaint show a motive to commit fraud and/or identify circumstances that indicate conscious behavior, the Court finds that the allegations are adequate for an inference of fraudulent intent notwithstanding that the economic downturn in 2018 may be an alternative reason for On-Site's failure to repay Mansfield.

### (3)      Justifiable Reliance

The Capitala Defendants contend that the facts alleged do not support the conclusion that Mansfield's reliance on McGlinn's statements regarding the value of "cash in-inflows" and "working capital items" was reasonable. According to the Capitala Defendants, Mansfield had access to vast quantities of data related to On-Site's financial performance, which it could have used to assess On-Site's value, and, therefore, it is unreasonable as a matter of law for Mansfield to allege that it advanced $4.8 million on the strength of the simple balance sheet attached to McGlinn's email. In support of their argument, the Capitala Defendants cite the decision of the

Supreme Court of New York in *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59 (N.Y. App. Div. 2012).  There, the New York Supreme Court dismissed a cause of action for fraud based on a New York law that imposed an affirmative duty on sophisticated investors to protect themselves from misrepresentations by investigating the details of transactions.  *Id*. at 66.

The New York law applied in *HSH Nordbank AG* does not exist in Mississippi.  As mentioned by the U.S. Supreme Court in *Field v. Mans*, 516 U.S. 59, 75 n.12 (1995), Mississippi uses the justifiable reliance standard, which does not impose a special duty on "sophisticated investors" and that carries a lesser burden than the reasonable reliance standard embraced in other jurisdictions.  *Ill. Cent. R.R. Co. v. Harried*, 681 F. Supp. 2d 772, 777 (S.D. Miss. 2009).  In *Hosford v. McKissack*, 589 So. 2d 108, 111 (Miss. 1991), for example, the Mississippi Supreme Court quoted with approval section 552 of the *Second Restatement of Torts*:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss cause to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552 (emphasis added).

Like the Supreme Court in *Field*, the Fifth Circuit in *Veritex Community Bank v. Osborne (In re Osborne)*, 951 F.3d 691 (5th Cir. 2020), discussed the justifiable reliance standard under a provision of the Bankruptcy Code, 11 U.S.C. § 523(a)(2), that excepts debts from discharge for money obtained by means of a fraudulent written statement concerning a debtor's financial condition.  The Fifth Circuit noted three factors, among others, that a court may consider in assessing whether a plaintiff's reliance was reasonable, including whether:  (1) "there had been previous business dealings with the [defendant] that gave rise to a relationship of trust"; (2) there were "any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that

the representations relied upon were not accurate"; and (3) an "even minimal investigation would have revealed the inaccuracy of the [defendant's] representations." *Osborne*, 951 F.3d at 698 (citations & quotations omitted). None of these factors indicates that Mansfield's reliance on McGlinn's statements was unjustified as a matter of law.

Mansfield and On-Site, through McGlinn, had an on-going business relationship. McGlinn was no stranger to Mansfield. The allegations in the Complaint do not reveal any "red flags" that should have alerted Mansfield that McGlinn's statements were not credible. Moreover, there are no allegations indicating that a minimal investigation by Mansfield would have uncovered the inaccuracy of the information provided by McGlinn. Although the main fact relied upon by the Capitala Defendants in support of their argument—that the SAA was a sophisticated commercial transaction—may raise a factual dispute as to whether Mansfield's reliance was justifiable, the resolution of that dispute is inappropriate at this pleading stage. The allegations, if accepted as true, are sufficient to satisfy the justifiable reliance element of Mansfield's fraud and negligent misrepresentation claims.

### (4)   Merger Clauses

The Capitala Defendants contend that neither the SAA nor the TPA required On-Site to preserve any specific assets as collateral or designate any assets to repay Mansfield, and both agreements contain merger clauses. The SAA provides, in pertinent part, "This Agreement, together with all referenced attachments, schedules and documents shall constitute the entire agreement between the parties with respect to the subject matter hereof and thereof." (Adv. Dkt. 77-1, Ex. 1 ¶ 35). The TPA similarly provides: "This Agreement expresses the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior inconsistent agreements and understandings." (Adv. Dkt. 77-3, Ex. 3 ¶ 15). These merger clauses,

according to the Capitala Defendants, show that Mansfield could not have reasonably relied on McGlinn's statements

The purpose of a merger clause is to invoke the parol evidence rule, which renders evidence regarding prior or contemporaneous oral agreements or prior written agreements inadmissible when offered to vary the terms of a fully integrated, unambiguous, written agreement. *Sec. Mut. Fin. Corp. v. Willis*, 439 So. 2d 1278, 1281 (Miss. 1983). In Mississippi, neither a merger clause nor the parol evidence rule precludes claims of fraudulent inducement. *Crosby Mem'l Hosp. v. Abdallah*, 48 F. App'x 102 (5th Cir. 2002) (citing *Brown v. Ohman*, 42 So. 2d 209 (Miss. 1949); *Turner v. Terry*, 799 So. 2d 25, 34 (Miss. 2001)). They survive because the "fraud may have induced [the plaintiff] to sign the contract, merger clause and all." *Id.*; *see Sw. Miss. Reg'l Med. Ctr. v. PST Servs., Inc.*, No. 5:16-cv-00028-DCB-MTP, 2016 WL 6407959, at *6 (S.D. Miss. Oct. 28, 2016). Moreover, Mansfield's claim of negligent misrepresentation is a tort to which rules of substantive contract law, like the parol evidence rule, do not apply. *See Nichols v. Shelter Life Ins. Co.*, 923 F.2d 1158, 1163 (5th Cir. 1991).

### (5)   Summary—Fraud and Negligent Misrepresentations

The Court finds that Mansfield's fraud and negligent misrepresentations claims against the Capitala Defendants are pleaded with sufficient specificity to satisfy the requirements of Rule 9(b). The allegations in the Complaint set forth the "who, what, when, and where" of the alleged fraud. *WMX Techs., Inc.*, 112 F.3d at 178. Mansfield provides the date, the contents, and the identity of the person who made the alleged false representations. "Fraud is essentially a question of fact best left for the [factfinder]." *Allen v. Mac Tools, Inc.*, 671 So. 2d 636, 643 (Miss. 1996).

### b. Tortious Interference with Contract

Mansfield alleges that the SAA prohibited On-Site and its owners, including Capitala and Harbert, from selling or soliciting a sale of On-Site's assets without Mansfield's consent during the four-year option period.  (Adv. Dkt. 77 ¶ 75; Adv. Dkt. 77-1).  Mansfield claims that "by authorizing, directing, acquiescing in or failing to prevent" the sale of On-Site's assets to Diesel Direct, Inc., the Capitala Defendants "blatantly disregarded and tortiously interfered with Mansfield's contractual rights under the SAA."  (Adv. Dkt. 77 ¶ 76).

The Capitala Defendants contend that Mansfield's allegations in the Complaint at best show that they were complicit in On-Site's alleged breach of the SAA, and that mere complicity is insufficient to state a claim for tortious interference.  They also argue that Mansfield failed to allege in the Complaint that the SAA was in force at the time of the "fire sale" or that On-Site would not have sold its assets to Diesel Direct, Inc. but for the interference of the Capitala Defendants.

"An action for interference with contract generally will lie against one who maliciously interferes with a valid and enforceable contract, causing one party not to perform and resulting in injury to the other party."  *Collins v. Collins*, 625 So. 2d 786, 790 (Miss. 1993).  "In this context, 'malicious' is defined as the intentional doing of a harmful act without legal or sound justification or excuse, in other words, the willful violation of a known right."  *Id*.  The elements of the tort are: (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) that actual damage and loss resulted.  *Id*. (listing authorities).  In addition, the plaintiff must prove that an enforceable obligation existed between the plaintiff and another party

and that the contract would have been performed but for the alleged interference of the defendant. *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss. 1998).  "The element of willfulness and calculation does not require a showing on the part of the plaintiff that defendant had a specific intent to deprive plaintiff of contractual rights.  Rather, the requisite intent is inferred when defendants knows of the existence of a contract and does a wrongful act without legal or social justification that he is certain or substantially certain will result in interference with the contract."  *Id.* (quoting *Liston v. Home Ins. Co.*, 659 F. Supp. 276, 281 (S.D. Miss. 1986)).

The Court finds that the allegations in the Complaint suggest that the Capitala Defendants orchestrated the breach of the SAA.  *See Rex Distrib. Co. v. Anheuser-Busch, LLC*, 271 So. 3d 445, 453 (Miss. 2019) (allegation of concerted activity is sufficient to state a tortious interference claim against a passive participant).  The formation of the Special Committee consisting of McGlinn and Harrison shows that Capitala and Harbert had knowledge of the SAA's provision prohibiting the sale of On-Site's assets.  At the meeting on October 22, 2018, McGlinn advised Byrd that unless Mansfield resumed regular payments, On-Site would be shut down and Mansfield would "have a big write off."  (Adv. Dkt. 77 ¶ 56).  The next day, On-Site informed its customers that it would not remain in business, and a week later, On-Site sold its assets to Diesel Direct, Inc. (Adv. Dkt. 77 ¶¶ 57, 60).  The "fire sale" could not have occurred without the knowledge and approval of the Capitala Defendants under Mississippi law.  MISS. CODE ANN. § 79-4-12.02 (requiring director and shareholder approval of such actions).

The Court also finds that Mansfield's allegation that the SAA was breached necessarily infers that the obligation was still in effect at the time of the "fire sale."  In summary, McGlinn's statements immediately preceding the "fire sale," among other allegations including the meetings that occurred in October 2018, are sufficient to state a claim for tortious inference with contract.

*See Bally Gaming, Inc. v. Caldwell*, 12 F. Supp. 3d 907, 915-16 (S.D. Miss. 2014) (holding that complaint sufficiently stated claim for relief where plaintiff alleged that manager and controlling interest holder directed, consented to, and acquiesced in the commission of tortious acts, including the tortious breach of contract).

### c.    Aiding and Abetting Breach of Duty

Mansfield alleges that "[w]ith the substantial assistance, encouragement, and authorization of Defendants, On-Site breached its duty of good faith and fair dealing" to Mansfield.  (Adv. Dkt. 77 ¶¶ 79-80).   Specifically, Mansfield alleges that with the knowledge and assistance of the Defendants, On-Site converted customer payments that should have been remitted to Mansfield "to fund operations and purchase equipment."  (Adv. Dkt. 77 ¶ 80).  This conduct, according to Mansfield, constituted a breach by On-Site of the implied duty of good faith and fair dealing of the SAA.  (Adv. Dkt. 77 ¶ 80).  *Jones v. Miss. Insts. of Higher Learning,* 264 So. 3d 9, 18-20 (Miss. Ct. App. 2018) (inherent in any contractual relationship is the implied duty of good faith and fair dealing) (citing *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992)); see *Harried*, 681 F. Supp. 2d at 778 (holding that the breach of good faith and fair dealing is a tort that "emanates from the law on contracts") (citing *Braidfoot v. William Carey Coll.*, 793 So. 2d 642, 651 (Miss. Ct. App. 2000)).

Section 876 of the *Second Restatement of Torts* addresses the related claims of civil conspiracy and civil aiding and abetting.  Section 876(a) sets forth the elements of a claim for civil conspiracy, whereas the elements of a claim for civil aiding and abetting are laid out in sections 876(b) and 876(c).  The two subsections on aiding and abetting differ.  Under section 876(b), liability exists when a party "knows that [another tortfeasor's] conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other."  RESTATEMENT (SECOND) OF

TORTS § 876(b).  Under section 876(c), liability exists "for harm resulting to a third person from the tortious conduct of another, . . . if he . . . gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."  *Id*. § 876(c).  Unlike section 876(b), section 876(c) does not require that a party know that the tortfeasor's conduct constituted a breach of duty.  *See Henderson v. Cmty. Bank of Miss. (In re Evans)*, 464 B.R. 272, 292 (Bankr. S.D. Miss. 2011) (declining to recognize an aiding and abetting claim in Mississippi brought under the auspices of section 876(c) of the *Second Restatement of Torts* because of this difference).  It appears that Mansfield's aiding and abetting claim rests on section 876(b) rather than section 876(c) because of allegations in the Complaint of the formation of the Special Committee consisting of McGlinn and Harrison indicating that the Capitala Defendants were aware of On-Site's obligations under the SAA.

The Capitala Defendants seek the dismissal of Mansfield's aiding and abetting claim on the ground that Mississippi does not recognize such a cause of action.  *Travelers Cas. & Sur. Co. of Am. v. Holloway*, No. 1:03CV762GURO, 2004 WL 7337455, at *3 (S.D. Miss. July 8, 2004) (dismissing claim for aiding and abetting breach of fiduciary duty in the absence of any Mississippi case law establishing such a cause of action).  Even if Mississippi recognized aiding and abetting as a cause of action, the Capitala Defendants argue that the Complaint fails to allege the underlying wrongful act that they allegedly aided and abetted or when or how they "assisted" or "encouraged" On-Site to misappropriate Mansfield's money.   The Court considers first the viability of Mansfield's aiding and abetting claim.

Mansfield contends that the Mississippi Supreme Court in *Bowden v. Young*, 120 So. 3d 971 (Miss. 2013), confirmed that aiding and abetting claims exist in Mississippi.  In *Bowden*, the plaintiffs sued their former employer "for multiple claims regarding the presence of toxic mold"

in the workplace.  *Id*. at 973.  The plaintiffs also sued the owner of the building where they worked.

Included among the plaintiffs' claims was a claim that the employer had aided and abetted the

building owner in maintaining a public and private nuisance.  The employer moved to dismiss all

claims asserted against it on the ground that the plaintiffs alleged only "unintentional torts" for

which the Mississippi Workers' Compensation Act provided the exclusive remedy.  *Id*. at 973

(citing MISS. CODE ANN. § 71-3-9).  The trial court denied the motion to dismiss, and the

Mississippi Supreme Court reversed on an interlocutory appeal.

The Mississippi Supreme Court in *Bowden* outlined what the plaintiffs would have to allege

to state a claim for aiding and abetting that fell outside the scope of the exclusivity provision of

the Mississippi Workers Compensation Act.  "To succeed in this claim, the plaintiffs would have

to prove that [the employer] gave substantial assistance to [the building owner] to maintain the

public and private nuisance with the actual intent to injure the plaintiffs."  *Id*. at 981.  The

Mississippi Supreme Court concluded that the plaintiffs had failed to plead facts satisfying the

requirement that the employer acted with "actual intent to injure" them in order to except the

Mississippi Workers Compensation Act's grant of exclusivity.  *Id*.

Because the Mississippi Supreme Court assumed the viability of the plaintiffs' aiding and

abetting claim without addressing the issue, the Court disagrees that *Bowden* pronounced or

confirmed the existence of such a claim.  Indeed, years after the Mississippi Supreme Court's

decision in *Bowden*, the Mississippi district court in *Jones v. KPMG LLP*, No. 1:17CV319-LG-

RHW, 2018 WL 5018469 (S.D. Miss. Oct. 16, 2018), noted that "no Mississippi court has

recognized a cause of action for aiding and abetting breach of fiduciary duty."  *Id*. at *2.  Mansfield

has not provided the Court with any Mississippi case decided since *Jones* that would change this

description of the status of such claims in Mississippi.

As this Court mentioned in *In re Evans*, the district court in *Dale v. Ala Acquisitions, Inc.*, 203 F. Supp. 2d 694, 700-01 (S.D. Miss. 2002), made an *Erie* guess that if presented with the question, Mississippi courts would recognize the existence of a cause of action for aiding and abetting fraud under section 876(b) of the *Second Restatement of Torts*: "(1) because a majority of other jurisdictions have done so and (2) because Mississippi recognizes the analogous tort of civil conspiracy." *Evans*, 467 B.R. at 409. Other district courts have referred to *Dale* but have not decided whether Mississippi would recognize the tort of aiding and abetting under section 876(b). *See Fikes v. Wal-Mart Stores, Inc.*, 813 F. Supp. 2d 815, 822 (N.D. Miss. 2011).

More recently, in *In re Deputy Orthopaedics, Inc.*, 888 F.3d 753 (5th Cir. 2018), the Fifth Circuit has restricted district courts from recognizing causes of action "not yet recognized by the state courts." *Id.* at 781. The Fifth Circuit noted that the debate as to whether the state courts, if squarely presented with the question, would recognize a cause of action for aiding and abetting was beside the point. By relying on aiding-and-abetting decisions of state-court cases that did not address the question directly, the district court "exceeded its circumscribed institutional role and 'expand[ed] [state] law beyond its presently existing boundar[y].'" *Id.* (quoting *Rubinstein v. Collins*, 20 F.3d 160, 172 (5th Cir. 1994)). This Court, relying on *Deputy*, holds that in the absence of any direct pronouncement by Mississippi courts recognizing aiding and abetting as a cause of action, no such claim exists in Mississippi.[17] Mansfield's claims against the Capitala Defendants for aiding and abetting On-Site's breach of the duty of good faith and fair dealing, therefore, should be dismissed. This conclusion renders it unnecessary for the Court to address the Capitala

---

[17] Likewise, no such claim apparently exists in North Carolina. *See Laws v. Priority Tr. Servs. of N.C., L.L.C.*, 610 F. Supp. 2d 528, 532 (W.D.N.C. 2009).

Defendants' other arguments that the Complaint fails to allege any underlying wrongful act or when or how they "assisted" or "encouraged" On-Site.

### d.    Civil Conspiracy

In addition to alleging that agency relationships existed among all of the Defendants, Mansfield alleges that the Capitala Defendants engaged in a civil conspiracy with the Harbert Defendants and On-Site to induce Mansfield to enter into the SAA, extend credit to On-Site pursuant to the TPA, and dissipate On-Site's assets in a "fire sale."  (Adv. Dkt. 77 ¶¶ 78-84).  A civil conspiracy occurs when a combination of persons conspires "for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004).  A civil conspiracy consists of the following elements:  (1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, and (4) damages to the plaintiff as a proximate result. *Bradley v. Kelley Bros. Contractors, Inc.*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013).

The Capitala Defendants contend that the civil conspiracy claim fails because the Complaint fails to allege a civil conspiracy between two persons or entities, and "a corporation cannot conspire with itself any more than a private individual can." *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952).  The Capitala Defendants argue that the Complaint contains several allegations about what officers and directors of On-Site said to Mansfield but does not identify instances involving the Capitala Defendants or Harbert.  The Capitala Defendants' argument appears to be based on the premise that McGlinn made the alleged fraudulent misrepresentations to Mansfield solely in his capacity as a director of On-Site. Mansfield's allegations, however, support an inference that McGlinn was acting on behalf of the

Defendants who shared a unity of purpose and combined their efforts through the formation of a Special Committee to achieve an alliance with Mansfield.  *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984).  The Court finds that the allegations in the Complaint allege a conspiracy involving more than On-Site.  (Adv. Dkt. 77 ¶ 14, 15, 17, 24, 25, 33).

The Capitala Defendants also contend that the civil conspiracy claim fails because the Complaint does not allege an underlying tort.  They cite *Langston v. 3M Co.*, No. 2:12cv163-KS-MTP, 2013 WL 2318790, at *3 (S.D. Miss. May 28, 2013), a product liability case, where the district court granted summary judgment in favor of the defendant on the plaintiff's civil conspiracy claim on the ground that the plaintiff failed to produce any evidence linking his injury to a product manufactured by the defendant.  *Id*. at *2-3.  At the pleading stage of the Adversary, the Court does not apply the standard used by the district court in *Langston* in determining whether a genuine dispute exists as to the presence of a foundation tort.  Here, Mansfield alleges that the Defendants achieved the alliance with Mansfield through unlawful means—by making fraudulent misrepresentations to Mansfield about On-Site's viability and ability to repay the debt.  Mansfield further alleges that McGlinn's false assurances to Byrd constitute overt acts in furtherance of the conspiracy and implicate all Defendants in the scheme, which the Court finds is sufficient to state a claim.  *See Rex,* 271 So. 3d at 455.

### 5.    Statutory Claim

Mansfield seeks treble damages against the Capitala Defendants under the NC UDTPA, which prohibits "unfair methods of competition, and unfair or deceptive acts or practices in or affecting commerce."  N.C. GEN. STAT. § 75-1.1.  "It gives a private cause of action to consumers aggrieved by unfair or deceptive business practices."  *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 519 (4th Cir. 1999) (citing *Marshall,* 276 S.E.2d at 400).  To state a claim under NC

UDTPA, a plaintiff must allege: (1) an unfair or deceptive act or practice (2) in or affecting commerce (3) which proximately caused injury to the plaintiff or his business. *Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*, 845 F.3d 104, 109 (4th Cir. 2016). A practice is "deceptive" if "it has a tendency or capacity to deceive." *Id*. A practice is "unfair" if "it offends established public policy," "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," or "amounts to an inequitable assertion of . . . power or position." *Id*. (quoting *Carcano v. JBSS, LLC*, 684 S.E.2d 41, 50 (N.C. Ct. App. 2009)); *see Kewaunee Sci. Corp. v. Pegram*, 503 S.E.2d 417, 420 (N.C. 1998) (holding that fraud is a basis for finding a violation of NC UDTPA). The Defendants argue that Mansfield fails to state a cognizable claim under the NC UDTPA because the Complaint does not allege that Mansfield suffered an injury to any business interest in North Carolina.

Mansfield contends that North Carolina law applies under Mississippi's conflict-of-laws principles. In Mississippi, if there is a "true conflict" between the laws of two states with an interest in the litigation, the choice of law is resolved by conducting the following three-step analysis: "(1) determine whether the laws at issue are substantive or procedural; (2) if substantive, classify the laws as either tort, property, or contract; and (3) look to the relevant section of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS." *Hartford Underwriters Ins. Co. v. Found. Health Servs., Inc.*, 524 F.3d 588, 593 (5th Cir. 2008). The Mississippi district court in *Koch Foods, Inc. v. Pate Dawson, Inc.*, Case No. 3:16-cv-00355-DCB-MTP, 2017 WL 4818426 (S.D. Miss. Oct. 25, 2017), recognized that a "true conflict" exists between the laws of Mississippi and North Carolina relative to unfair and deceptive trade practices claims. *Id*. at *3 (comparing MISS. CODE ANN. § 75-24-5 with N.C. GEN. STAT. § 75-1.1). In Mississippi, only a "consumer" may bring a private action for unfair and deceptive trade practices and only after attempting to resolve

the claim through an informal dispute settlement program approved by the Mississippi Attorney General.  MISS. CODE ANN. § 75-24-15.  In contrast, standing to bring a claim for unfair and deceptive trade practices is not so limited.  *See United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F. Supp. 1041, 1046 (E.D.N.C. 1979) (noting that the plain wording of the statute provides a civil remedy for unethical practices between persons engaged in business and is not limited to individual consumers); *see also Newton v. Barth*, 788 S.E.2d 653, 659-60 (N.C. Ct. App. 2016) (holding that the creditor of a bankruptcy estate may pursue NC UDTPA claims against the officers and directors of the debtor who actively participated in conduct causing harm to the creditor).

After concluding that a claim for unfair and deceptive trade practices is "substantive" under Mississippi law and sounds in tort, the district court in *Koch Foods* applied sections 145 and 6 of the *Second Restatement of Conflict of Laws*.  *Koch Foods*, 2017 WL 4818426, at *3-4.  Section 145 directs the court to apply the law of the state with the "most significant relationship" to the occurrence and parties in light of these tort-specific contacts:  (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.  *Koch Foods*, 2017 WL 4818426, at *3-4 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145).  Section 6 provides seven general choice of law considerations that also should be reviewed by the court, including: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability, and uniformity of result; and (g) ease in the

determination and application of the law to be applied. *Id.* (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)).

The district court, after considering these guideposts, concluded that North Carolina had the most significant relationship to the parties with respect to the alleged unfair and deceptive trade practices. Koch Foods, Inc. ("Koch"), a poultry processor in Illinois, brought the claim against the former officers and directors of Pate Dawson Company ("PDC"), a failed foodservice distributor in North Carolina, after Koch was unable to collect a debt owed by PDC for chicken processed in, and delivered from Mississippi. *Koch Foods*, 2017 WL 4818426, at *4. Although suit was brought in Mississippi, none of the parties was a Mississippi citizen. The district court noted that the place of the conduct causing injury was "hazy" but was likely North Carolina where PDC was incorporated and maintained its principal place of business and also where the individuals resided. *Id.* The district court found that the place of injury could be either Mississippi where Koch sold the chicken products or Illinois where Koch's "nerve center" was located and, thus, where any business loss would be most acutely felt. The district court reached the conclusion that North Carolina had the most significant relationship to the parties because "North Carolina has a strong interest in regulating the conduct of corporations doing business within its borders" and because the parties did not identify "a forum policy or interest sufficiently important to trump North Carolina's regulatory interest." *Id.* Mansfield touts *Koch Foods* as factually analogous.

The place of conduct causing Mansfield's alleged injury is North Carolina where Capitala and Harbert exercised control of On-Site's business through their joint venture. *Bybee v. Island Haven, Inc.*, 817 S.E.2d 497 (N.C. Ct. App. 2018) ("by asserting that the alleged unfair and deceptive acts [of one defendant] were in furtherance of the joint venture, . . . Plaintiff has sufficiently pleaded" that the defendant's conduct was "in or affecting commerce," the second

element of a NC UDTPA claim).  Capitala is organized in North Carolina, and McGlinn resides in North Carolina.  Mansfield is a Georgia company with its principal place of business in Georgia. Similar to the district court's holding in *Koch Foods*, the Court finds that North Carolina has the most significant relationship.[18]

The Capitala Defendants attempt to distinguish *Koch Foods* on the ground that the parties there agreed that North Carolina law applied to other claims asserted in the lawsuit.  Because there was a "true conflict" in the laws of North Carolina and Mississippi as to these claims alleged by Koch as well as to the unfair and deceptive trade practices claim, the district court engaged in a choice-of-law analysis, notwithstanding the parties' agreement, which led to the application of North Carolina law.  Here, that analysis is unnecessary as to Mansfield's other tort claims because the parties agree there is no "true conflict" between the laws of Mississippi and North Carolina. Indeed, the district court in *Koch Foods* applied Mississippi law to Koch's conspiracy claim "[b]ecause the laws of Mississippi and North Carolina are in accord on the elements of conspiracy."  *Koch Foods*, 2017 WL 4818426, at \*3.

According to the Capitala Defendants, even if North Carolina law applies under Mississippi's choice of law analysis, it does not resolve the issue regarding the extraterritorial reach of NC UDTPA.  *See Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 640 F. Supp. 1411, 1427 (E.D.N.C. 1986); *see also ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 48 n.9 (4th

---

[18] The Capitala Defendants contend that the SAA includes a choice-of-law provision that states that the SAA is governed by Georgia law.  (Adv. Dkt. 77-1 at 12).  Under Mississippi law, where a choice of law provision states an agreement is "governed by" the law of another state, the law of the selected states applies to contract-based claims.  *Russell v. Allianz Life Ins. Co. of N. Am.*, No. 3:13-CV-00030-DMB-JMV, 2014 WL 4545807, at \*4 (N.D. Miss. Sept. 12, 2014). Here, however, Mansfield's claims are tort based.  No issue of contractual construction, interpretation, or enforcement is raised by Mansfield.

Cir. 1983).  The North Carolina Supreme Court has not addressed whether the NC UDTPA reaches a "foreign"[19] plaintiff like Mansfield.  Capitala Defendants contend that there is a majority and minority view among the federal courts in North Carolina regarding the permissible scope of the NC UDTPA.  *Bondi v. Bank of Am. Corp. (In re Parmalat Sec. Litig.)*, 383 F. Supp. 2d 587, 604 (S.D.N.Y. 2005).  Pursuant to the majority view, first pronounced in *The 'In' Porters, S.A. v. Hanes Printables, Inc*., 663 F. Supp. 494 (M.D.N.C. 1987), the plaintiff must have suffered an injury in North Carolina to state a claim under the NC UDTPA.  *See Parmalat*, 383 F. Supp. 2d at 603-04 nn.80-81 (observing that "the overwhelming majority of federal district courts to consider [this issue], most of which are in North Carolina, have limited Section 75-1.1's application to "cases involving substantial effect on a plaintiff's in-state business operation").  The minority view, as set forth in *Hardee's Food Sys., Inc., v. Beardmore*, No. 5:96-CV-508-BR(2), 1997 WL 33825259, at *3 (E.D.N.C. June 6, 1997), allows an action for an out-of-state injury but requires allegations that the conduct substantially impacted North Carolina commerce.  The Capitala Defendants urge the Court to adopt the majority view in *'In' Porters*.

In *'In' Porters*, the plaintiff, 'In' Porters, was a French company that entered into an exclusive distributorship agreement with Hanes Printables ("Hanes") to distribute imported outerwear to retailers in France.  *'In' Porters*, 663 F. Supp. at 495-96.  Hanes was a Delaware corporation with its principal place of business located in North Carolina.  The parties' agreement was negotiated primarily in North Carolina.  Approximately one year after entering into the agreement, Hanes' distributor in Belgium began invading the territory assigned to 'In' Porters in France.  'In' Porters sued Hanes in district court in North Carolina for violation of the NC UDTPA.

---

[19] By "foreign," the Court means a party or entity not based in, or a resident of North Carolina.

There was no allegation that the negotiations that took place in North Carolina gave rise to the NC UDTPA claim, and, therefore, the only conduct alleged to have violated the NC UDTPA occurred in France.  The claim, therefore, arose solely from alleged conduct and injuries occurring in France. The district court concluded that a plaintiff suing in North Carolina for an injury that it incurred in a foreign jurisdiction cannot maintain an action for NC UDTPA consistent with the due process clause without showing "a sufficient state interest in the litigation such that application of North Carolina's law is 'neither arbitrary nor unfair.'"  *Id*. at 502.  Because 'In' Porters could not prove an in-state injury and had no business operations in North Carolina, the district court dismissed its claim.

Mansfield acknowledges that the decisions of the federal courts in North Carolina have produced a split of authority as to whether an in-state injury is required but argues that the majority view has changed and now embraces the reasoning of *Hardee's*.  In *Hardee's*, a North Carolina-based franchisor moved to dismiss a NC UDTPA claim brought by its Nebraska-based franchisee. *Hardee's*, 1997 WL 33825259, at *1-2.  The district court first considered the language of the NC UDTPA, which it described as "broad in scope," and observed that it contains "no geographical restrictions on its applicability."  *Id*. at *2-3.  The court also noted that the original NC UDTPA had been amended to remove the restrictive language "within the state," and that since then, the NC UDTPA has been found applicable "to the full extent permissible under conflicts of law principles and the Constitution."  *Id*. at *3 (quoting *Am. Rockwool, Inc.*, 640 F. Supp. at 1427). The *Hardee's* court also recognized that other federal courts in North Carolina had "applied § 75-1.1 where the out-of-state plaintiff conducts continuing business transactions with an in-state defendant and is injured by the defendant's in-state activities."  *Id*. (citing *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 945 F. Supp. 901 (W.D.N.C. 1996), *rev'd on other grounds*, 155 F.3d

331 (4th Cir. 1998); *Jacobs v. Cent. Transp., Inc.*, 891 F. Supp. 1088 (E.D.N.C. 1995), *aff'd in part & rev'd in part*, 83 F.3d 415 (4th Cir. 1996)).  Thus, the *Hardee's* court concluded that the alleged claim fell within the scope of the NC UDTPA where the plaintiff's injury resulted from the defendant's "alleged misrepresentations and misconduct, based on decisions which [the defendant] made, in all probability, in North Carolina." *Id.*  According to Mansfield, three district courts in North Carolina recently have distinguished *'In' Porters* and have followed the reasoning of *Hardee's*.  *Hometown Publ'g, LLC v. Kidsville News!, Inc.*, No. 5:14-CV-00076-FL, 2014 WL 7499450 (E.D.N.C. Oct. 3, 2014); *Verona v. U.S. Bancorp*, No. 7:09-CV-00057-BR, 2011 WL 1252935 (E.D.N.C. Mar. 29, 2011); *Ada Liss Grp. v. Sara Lee Corp.*, No. 06CV610,  2010 WL 3910433 (M.D.N.C. Apr. 27, 2010).

       In *Ada Liss*, the Sara Lee Corporation ("Sara Lee"), a North Carolina company, entered into a distribution agreement with an Israeli company, the Ada Liss Group ("Ada Liss"), granting Ada Liss the exclusive right to distribute certain apparel in Israel.  *Ada Liss,* 2010 WL 3910433, at * 2.  Years later, Ada Liss noticed that "parallel imports" from other wholesale customers of Sara Lee were being sold to customers in Israel in violation of the distributorship agreement.  To resolve their dispute, the president of Ada Liss traveled to North Carolina to meet with Sara Lee's legal counsel and vice president.  While there, Ada Liss entered into a second distributorship agreement as well as a settlement agreement in which Sara Lee promised to take certain actions in an effort to stop the "parallel imports" in Israel.  The "parallel imports" continued, and Ada Liss sued Sara Lee under the NC UDTPA, alleging that Sara Lee fraudulently induced Ada Liss to sign the settlement agreement.  Sara Lee argued that the district court lacked jurisdiction based on *'In' Porters*.

The district court distinguished *'In' Porters* where the record showed exclusively foreign misconduct and damages to the plaintiff's exclusively foreign operations.  Where Sara Lee—itself a resident of North Carolina—allegedly committed fraud in North Carolina, the question of extraterritorial application of the statute was not an issue.  "Because the conduct alleged took place in North Carolina, the court does not have to search for an impact on the Plaintiff's state operations or a strong state interest."  *Ada Liss*, 2010 WL 3910433, at *13.

The district court in *Verona* followed the courts' rationale in *Ada Liss* and *Hardee's*. *Verona*, 2011 WL 1252935, at *15.  The *Verona* court noted that the defendant's deceptive communications with the plaintiffs emanated from its corporate headquarters in North Carolina. *Id*.  The district court held that applying the NC UDTPA to a business in North Carolina that committed predicate acts within North Carolina did not implicate notions of unfairness or arbitrariness, nor did it unfairly burden interstate commerce.  *Id*. (citing *Ada Liss*, 2010 WL 3910433, at *14).  Also, that the foreign plaintiffs may have suffered financial harm "outside of North Carolina [did] not alter the court's analysis."  *Id*.

Finally, in *Hometown*, the district court likewise followed *Verona* and *Ada Liss*.  In *Hometown*, a New Jersey limited liability company sued a North Carolina business under the NC UDTPA based upon allegations arising out of the parties' licensing agreement.  *Hometown*, 2014 WL 7499450, at *2.  The defendant filed a motion to dismiss, arguing that the plaintiff could not maintain a NC UDTPA claim because "it alleged no harm to any North Carolina business interest." *Id*. at *3.  The district court ruled that such a showing was not required because the defendant's course of conduct causing the harm emanated from and was carried out in substantial part in North Carolina.  *Id*. at *6.

Since *Hometown*, *Verona*, and *Ada Liss* were decided, a different district court in North Carolina, citing '*In' Porters* and *Parmalat*, noted that "the majority of federal courts within North Carolina hold that a [NC UDTPA] plaintiff must have suffered an injury in North Carolina." *Viper Publ'g, LLC v. Bailey*, No. 3:17-CV-00314, 2018 WL 3114536, at *4 (W.D.N.C. June 25, 2018). In *Viper*, the plaintiff was a Nevada company with its principal place of business in North Carolina. The plaintiff filed suit against a foreign individual for breach of contract in federal court in North Carolina. The defendant then filed a counterclaim against the plaintiff under the NC UDTPA. *Id.* at *1-2. The *Viper* court dismissed the defendant's counterclaim because he had "not alleged any in-state injurious effect to his business operations in North Carolina." *Id.* The *Viper* court did not mention the decisions of its sister courts in *Ada Liss, Verona*, or *Hometown*.

Similarly, a California district court in *Negrel v. Drive N Style Franchisor SPV LLC*, No. 8ACV 18-00583 JVS, 2018 WL 6136151, at *5 (C.D. Cal. Aug. 27, 2018), dismissed a NC UDTPA claim where the plaintiff failed to allege that the defendants engaged in any wrongful conduct in North Carolina. In *Negrel*, the plaintiffs were French citizens and permanent residents of California. The defendant was a franchising business located in North Carolina. After disputes arose concerning the parties' franchise agreements, the plaintiff filed suit in California alleging a claim under NC UDTPA. The *Negrel* court noted the split of authority between '*In' Porters* and *Hardee's* and followed '*In' Porters*. *Id*. at *5.

In *Koch Foods*, the Mississippi district court did not address the split of authority among the district courts in North Carolina regarding the extraterritorial reach of the NC UDTPA. The issue was not raised by the parties. The Court finds that its ruling, nevertheless, is consistent with *Hardee's* and its progeny. The Court likewise follows *Hardee's* and its analysis of '*In' Porters*. Because the alleged fraud against Mansfield emanated from North Carolina and was carried out in

substantial part in North Carolina,[20] it was unnecessary for Mansfield to allege in the Complaint that it suffered an injury in North Carolina to state a claim under the NC UDTPA.

### 6.    Summary—Rule 12(b)(6) Dismissal

The Court finds that the allegations in the Complaint contain sufficient facts which, if accepted as true, state plausible claims against the Capitala Defendants for fraud, negligent misrepresentations, tortious interference with contract, civil conspiracy, and violations of the NC UDTPA.  The allegations for aiding and abetting breach of duty do not state a plausible claim for relief and should be dismissed.

## C.    Summary—Capitala Motion

The Court finds that On-Site is not a required party under Rule 19(a) and that the relief requested in the Capitala Motion under Rule 12(b)(7) should be denied.  The Court further finds that the Complaint contains sufficient facts which, if accepted as true, state plausible claims against the Capital Defendants for fraud, negligent misrepresentations, tortious relief with contract, civil conspiracy, and violations of the NC UDTPA.  The relief requested in the Capitala Motion as to these claims under Rule 12(b)(6) should be denied.  Finally, the Court finds that Mansfield's remaining claim against the Capitala Defendants of aiding and abetting breach of duty fails to state a claim and that the relief requested in the Capitala Motion under Rule 12(b)(6) should be granted.

## II.    HARBERT MOTION

In the Harbert Motion, the Harbert Defendants seek dismissal of all claims asserted against them under Rule 12(b)(7) for failure to join On-Site as a necessary and indispensable party or, in

---

[20] The Capitala Defendants argue that the allegation that McGlinn's email address block gave a North Carolina address does not appear in the Complaint and cannot be relied upon by Mansfield to show that the fraud emanated from North Carolina.  Copies of McGlinn's emails, however, are attached as exhibits to the Complaint from which this information is readily apparent. (Adv. Dkt. 77-2, 77-5).

the alternative, a judgment on the pleadings under Rule 12(c).  The Court already has addressed the joinder issue as to all Defendants.[21]  Only the request of the Harbert Defendants for a judgment on the pleadings under Rule 12(c) remains.

## A.    Rule 12(c) Judgment on the Pleadings

The Harbert Defendants contend that Mansfield's "shotgun" Complaint attributes the majority of its factual allegations to either McGlinn or the Defendants collectively and thus fails to state a claim against either Harbert or Harrison.  According to the Harbert Defendants, the deficiencies in the Complaint largely stem from Mansfield's attempt to impose liability upon them without piercing the corporate veils of On-Site Fuel Holding, Inc. and On-Site.[22]  They argue that the Complaint fails to give proper notice of their alleged misconduct and should be dismissed.

### 1.    Rule 12(c) Standard

Rule 12(c) permits a party to move for a judgment on the pleadings.  A Rule 12(c) motion "is designed to dispose of cases where material facts are not in dispute and judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990).  The standard for deciding a motion for judgment on the pleadings pursuant to Rule 12(c) is the same as the standard that applies to a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure*." Doe v. MySpace, Inc.*, 529 F.3d 413, 418 (5th Cir. 2008).  Unlike a Rule 12(b)(6) motion, however, a motion for judgment on the pleadings is directed towards a

---

[21] *See supra* pp. 21-35.

[22] A creditor generally lacks standing to assert an alter ego claim against the parent of a corporate debtor because such a claim ordinarily is property of the estate.  *See S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1153 (5th Cir. 1987).

determination of the substantive merits of the parties' dispute based on the pleadings.  *Commodity Futures Trading Comm'n v. Montano*, No. 6:18-cv-1607, 2019 WL 3219659 (M.D. Fla. July 17, 2019).  The general pleading standard of Rule 8 and the heightened pleading standard of Rule 9(b) have been discussed previously and will not be repeated here.[23]

### 2.   Extrinsic Evidence

The Harbert Defendants refer to the Stockholders Agreement to dispute the existence of a joint venture or other agency relationship between Harbert and Capitala.  The Harbert Defendants argue that their reference to the Stockholders Agreement, attached as an exhibit to the Harbert Answer, is appropriate under Rule 12(c).  "A court in ruling on a motion for judgment on the pleadings may consider not only the pleadings themselves, but also any exhibits to the pleadings or matters incorporated by reference in the pleadings, as long as all the material allegations of fact are undisputed and only questions of law remain to be decided by the court."  *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 834 (E.D. Tex. 2014).

The Court refused to consider the Stockholder Agreement in ruling on the Capitala Defendants' Rule 12(b)(6) motion because the Complaint did not mention it, and it was not central to Mansfield's claims or subject to judicial notice.[24]   The Court declines to consider the Stockholder Agreement in ruling on the Harbert Defendant's Rule 12(c) motion for the same reasons.  The Texas district court's decision in *Loyalty* does not support a different result.  The Harbert Defendants rely on the Stockholders Agreement to create a factual issue whereas the

---

[23] *See supra* pp. 36-37, 41-42.

[24] *See supra* pp. 37-38.

parties in *Loyalty* presented only a question of law, which the district court regarded as appropriate for disposition under Rule 12(c).

### 3.   Choice of Law

Like the Capitala Defendants and Mansfield, the Harbert Defendants cite Mississippi law without engaging in any choice-of-law analysis.  For the reasons discussed previously, the Court determines the adequacy of Mansfield's allegations against the Harbert Defendants under Mississippi laws as briefed by the parties with the exception of its allegation related to its unfair and deceptive trade practices claim.[25]   The "true conflict" that exists between the laws of Mississippi and North Carolina as to that one claim requires a separate discussion.

### 4.   Is the Complaint an impermissible "shotgun" pleading?

The Harbert Defendants contend that the Complaint is an impermissible "shotgun" pleading because Mansfield does not attribute discrete acts of wrongdoing to them but instead lumps them in with allegations involving the Capitala Defendants' conduct.  Rule 8 and the *Twombly/Iqbal* pleading standards require that Mansfield provide "a 'short and plain statement' showing why [it is] entitled to relief from each Defendant."  *Copeland v. Axion Mortg. Grp. LLC*, No. 1:16cv159-HSO-JCG, 2016 WL 4250431, at *4 (S.D. Miss. Aug. 11, 2016).  The Fifth Circuit has discouraged the "shotgun approach to pleadings . . . where the pleader heedlessly throws a little bit of everything into his complaint in the hopes that something will stick."  *S. Leasing Partners, Ltd v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986).  Shotgun pleadings fail to satisfy the requirements of Rule 8 and "are subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6)."  *Copeland*, 2016 WL 4250431, at *4.

---

[25] *See supra* pp. 38-39.

The Harbert Defendants cite *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1325 (11th Cir. 2015), for the proposition that a shotgun pleading runs afoul of pleading requirements by lumping together allegations and making it "virtually impossible" for the defendant to formulate an answer. In *Weiland*, the Eleventh Circuit described a shotgun pleading as including "the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id*. According to the Harbert Defendants, the "sin" is not rare in this jurisdiction, and district courts in Mississippi routinely rebuke plaintiffs for engaging in such conduct.

The Harbert Defendants cite the Mississippi district court's decision in *Copeland*, where the plaintiff obtained a loan on the home he shared with his wife. *Copeland*, 2016 WL 4250431, at *4. Though the husband-plaintiff signed the deed of trust, his wife did not because the name of his former wife was listed on the signature page. The husband-plaintiff alleged that he was told the loan would not be submitted without his current wife's signature, but her signature allegedly was forged on the loan documents and the loan was submitted and approved anyway. The husband-plaintiff alleged that he would not have signed the note unless his wife had agreed to be jointly responsible for the debt. After the couple divorced, the wife received the marital home. When she discovered her forged signature, she allegedly attempted to raise the forgery with the servicers of the loan, but none would assist her. She alleged that an agent of one of them forged her signature.

The husband-plaintiff and his former wife brought suit against sixteen named defendants and forty fictitious defendants, asserting nine cause of actions generally and collectively without identifying which claims were being brought against which defendant. The district court granted

the defendants' Rule 12(b)(6) motion to dismiss with leave to file an amended complaint. "Even though the Court acknowledges that Plaintiffs are dealing with complex corporate identities such as these Defendants, this fact does not excuse Plaintiffs from adherence to the Rule 8 and the *Twombly/Iqbal* pleading standards by providing a 'short and plain statement' showing why they are entitled to relief from each Defendant." *Id.* at *4.

The Harbert Defendants cite another Mississippi district court decision, *Thomas v. Univ. of Miss.*, No. 3:18-cv-00062-GHD-RP, 2018 WL 6613807, at *1 (N.D. Miss. Dec. 17, 2018), where a professor who was terminated from his employment sued his employer, the Board of Trustees of the State Institution of Higher Learning, and several employees claiming that the defendants violated his Fourteenth Amendment rights by conducting an unfair Title IX investigation. *Thomas*, 2018 WL 6613807, at *1. The district court observed that "discern[ing] which claims [the plaintiff] makes against which Defendants . . . is impossible because [the plaintiff]'s amended complaint is a shotgun pleading." *Id.* at *5. The district court concluded that the plaintiff had committed a shotgun pleading "sin" because his complaint "assert[ed] each cause of action against all Defendants, even though it appears that [the plaintiff was] not and [could not] assert each cause of action against every Defendant." *Id.* Without individualized allegations specific to each defendant, a complaint fails to give proper notice to the defendant. *Doe v. Yackulic*, No. 4:18-CV-084-ALM-CAN, 2019 WL 1301998, at *15 (E.D. Tex. Feb. 19, 2019); *see Faye v. Miss. Dep't of Human Servs.*, No. 1:15cv429-HSO-JCG, 2016 WL 4250417, at *3 (S.D. Miss. Aug. 10, 2016) (acknowledging that the complaint described the overall circumstances of the dispute, but taking issue with the complaint's failure to plead sufficient facts "as to what wrongful conduct is attributed to each of the named Defendants").

The Court finds that Mansfield's Complaint differs from the "shotgun" pleadings at issue in *Copeland* and *Thomas* where the allegations failed to explain the relationships among the defendants or the factual basis for holding the defendants collectively responsible. In response to the Complaint (the "Original Complaint") (Adv. Dkt. 3) originally filed by Mansfield in the District Court on August 20, 2019, the Harbert Defendants filed a similar motion for a judgment on the pleadings arguing that the Original Complaint was a "shotgun" pleading that failed to plead with sufficient specificity the facts implicating their liability. (Adv. Dkt. 16). After the District Court's referral of the civil action, this Court granted Mansfield's request, which the Harbert Defendants did not oppose, to amend its Original Complaint.[26] (Adv. Dkt. 76). The amended Complaint expanded the factual allegations regarding Harbert's purported joint venture with Capitala and their alleged concerted actions in controlling On-Site and allegedly defrauding Mansfield. The amended version of the Complaint also added Harrison as a defendant.

It is not improper for a complaint to group defendants together where there is an obvious explanation for doing so based on their concerted activities. *Cook v. Miss. Farm Bureau Cas. Ins. Co.*, No. 1:18-cv-0076, 2018 WL 5929629, at *3 (N.D. Miss. Nov. 13, 2018) (noting that it is not improper for a pleading to group defendants together where the plaintiff alleges all defendants equally shared control over his employment); *Amin v. Mercedes-Benz USA, LLC*, 349 F. Supp. 3d 1338, 1352 (N.D. Ga. 2018) ("[T]he fact that defendants are accused collectively does not render the complaint deficient where it can fairly be read to aver that all defendants are responsible for the alleged conduct."). The "shotgun pleading" argument of the Harbert Defendants fails to consider that Mansfield's claims against the Defendants rest on a theory of agency liability—that

---

[26] The Court also dismissed the motion filed by the Harbert Defendants without prejudice as moot and without any prejudice to any party's rights to request or oppose the same relief in the future. (Adv. Dkt. 76).

the Defendants jointly controlled On-Site and jointly participated in the conduct causing harm to Mansfield.  Mansfield contends in the Complaint that an inter-connected and mutually dependent agency relationship existed between Harbert and Capitala regarding their shared investment in On-Site.  Individually, neither Harbert nor Capitala had a controlling interest in On-Site but together, by acting as one unit and voting their shares and board proxies in lock step with one another, they allegedly dominated and controlled On-Site's finances, operations, and strategic decisions.  (Adv. Dkt. 77 ¶¶ 14-15, 19).

The Complaint describes how Capitala and Harbert were able to govern On-Site by controlling its holding company's board of directors.  On-Site's board was composed of five (5) members.  Harbert and Capitala each had two board representatives.  Harrison was both the senior managing director of Harbert and Harbert's primary representative on On-Site's board.  McGlinn was a managing director of Capitala, served as chairman of On-Site's board of directors, and allegedly also served as On-Site's *de facto* chief executive.

As agents for the majority owners and On-Site, Harrison and McGlinn comprised a two (2)-member "Special Committee" of On-Site's board of directors, which Mansfield alleges was formed for the purpose of pursuing a business relationship with Mansfield.  (Adv. Dkt. 77 ¶ 20).  Mansfield contends that all Defendants were aware of On-Site's dire financial condition and that their motive was to shift the burden of funding On-Site's failing operations to Mansfield.  (Adv. Dkt. 77 ¶¶ 22-24).  According to Mansfield, the Defendants persuaded Mansfield to become a strategic partner by misrepresenting On-Site's viability.  Although McGlinn took the lead in these discussions with Mansfield, Mansfield alleges that Harrison was monitoring and directly involved in the process.  In an email to McGlinn on December 11, 2017, Harrison commented, "I'll be glad when we can turn that over to Mansfield."  (Adv. Dkt. 77 ¶ 25).  In response to a later email about

On-Site's poor performance in November 2017, Harrison's only remark was, "Are we making progress on Mansfield?" (Adv. Dkt. 77 ¶ 25).

Given these allegations, the Court finds that it was reasonable to infer that McGlinn had the full authority of both Harbert and Capitala in directing On-Site's operations and managing the Mansfield alliance. This inference is supported by the designation of Capitala as the "collateral agent" for both Harbert and Capitala with respect to On-Site's assets and property for the benefit of the joint venture. (Adv. Dkt. 77 ¶ 14).

The Court notes that while professing confusion as to which allegations in the Complaint apply to them, the Harbert Defendants managed to file the Harbert Answer and articulate arguments as to why Mansfield's allegations fail to state a claim for relief in the Harbert Brief. "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323. Where a defendant understands the claims well enough to file an answer and attack the merits, courts have held that it is disingenuous for the defendant to feign confusion about an alleged "shotgun" pleading. *Id.*; *see Your Baby Can, LLC v. Planet Kids, Inc.*, No. 10-81266, 2011 WL 197421, at *2 (S.D. Fla. Jan. 20, 2011) ("Filing an answer suggests to this Court that it was not 'virtually impossible' for Defendants to know which allegations of fact are intended to support which claim(s) for relief."). Instead, a defendant served with an alleged "shotgun" complaint is expected to move the court, pursuant to Rule 12(e), to require the plaintiff to provide a more definite statement. *Amin*, 349 F. Supp. 3d at 1350. Moreover, by filing an answer and a motion under Rule 12(c) challenging the substantive merits of Mansfield's claims, the Harbert Defendants may have waived any argument as to the alleged shotgun nature of the Complaint. *Montano*, 2019 WL

3219659, at *2, n.3.  The Court concludes that the Complaint adequately sets forth which factual allegations support which claims against the Harbert Defendants.  *Amin*, 349 F. Supp. 3d at 1350 (dismissing a complaint on "shotgun" pleading grounds is "reserved for only the most egregious cases where it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief") (citing *Weiland*, 792 F.3d at 1325).

The Harbert Defendants next contend that holding Harbert vicariously liable for the tort claims alleged against Harrison would be tantamount to piercing the corporate veils of On-Site and On-Site Holdings, Inc.,[27] which requires allegations of some abuse to their corporate forms. Such allegations, however, do not appear in the Complaint.  The Harbert Defendants argue that the Mississippi Supreme Court has rejected the contention that a parent can be "'vicariously liable' for the actions of the [subsidiary's] staff because the parent company set[] the policies of the [subsidiary] and [was] involved in its daily operations."  *Penn Nat'l Gaming, Inc. v. Ratliff*, 954 So. 2d 427, 431 (Miss. 2007).  The Mississippi Supreme Court has reasoned that such a claim "amount[ed] to an allegation that [the subsidiary was] merely the alter ego of [the parent], which would justify this Court's 'piercing the corporate veil' and attributing the acts or omissions of" the subsidiary to the parent.  *Id.*

The Harbert Defendants cite the Mississippi district court's decision in *Berhow v. The Peoples Bank*, 423 F. Supp. 2d 562 (S.D. Miss. 2006), where summary judgment was granted in favor of a parent company.  There, the plaintiff's claims against the parent company were based upon the following facts:  (1) the officers and members of the board of directors were the same for

---

[27] According to the Harbert Defendants, Mansfield would have to pierce two veils to reach Harbert:  (1) the corporate veil of On-Site to reach On-Site Fuel Holdings, Inc., which owns 100% of On-Site's stock, and (2) the corporate veil of On-Site Fuel Holdings, Inc. to reach Harbert and Capitala, the majority owners of On-Site Fuel Holdings, Inc.

both the parent company and the subsidiary; (2) the vice president of the subsidiary reported directly to the audit committee of the subsidiary as well as the audit committee of the parent company; and (3) the parent company controlled the subsidiary. Citing Mississippi law regarding piercing the corporate veil, the district court found that the parent company was entitled to judgment as a matter of law because the plaintiff "failed to provide any evidence that tends to show a frustration of contractual expectations, a flagrant disregard of corporate formalities, or a demonstration of fraud or some other equivalent misfeasance on the part of [the parent]." *Id*. at 566-67. The Harbert Defendants maintain that Mansfield's allegations do not differ in any meaningful way from those in *Berhow* and argue that this Court similarly should hold that there is no legal basis to impose liability on Harbert merely because Harbert and On-Site shared one officer, Harrison.

The Court agrees that directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent their corporations separately. *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997). The allegations of the Complaint, however, do not seek to hold Harbert liable merely because Harrison wore two hats as a board member of both Harbert and On-Site. The allegations instead support an inference that Harrison was not acting in his capacity as a director of On-Site when pursuing the alliance with Mansfield. For this reason, *Berhow* is factually distinguishable. The Harbert Defendants make a similar argument in their challenge to the sufficiency of Mansfield's fraud and negligent misrepresentations claims where these issues are re-examined. In summary, the Harbert Defendants have not shown that the Complaint is an impermissible "shotgun" pleading and are not entitled to a judgment on the pleadings on that ground.

### 5.    Does the Complaint state a claim for relief?

The Harbert Defendants contend that the Complaint fails to allege an agency relationship sufficient to state a claim against them for fraud, negligent misrepresentations, and tortious interference with contract.  They challenge the aiding and abetting breach of duty and the  unfair and deceptive trade practices claims on the ground Mississippi does not recognize such causes of action, and North Carolina law does not apply.  Finally, they challenge the civil conspiracy claim on the ground the allegations are insufficient to raise an inference of an agreement.

### a.    Fraud and Negligent Misrepresentations

In the Complaint, Mansfield alleges that when the concept of an alliance was being discussed with Mansfield, Harrison and McGlinn knew that On-Site's majority owners did not intend to infuse any additional money into On-Site.  The goal of their scheme, according to Mansfield, was to shift On-Site's need for operating capital from PNC Bank to Mansfield with the hope that Mansfield might turn around the business and one day exercise its option to acquire On-Site.  (Adv. Dkt. 77 ¶¶ 22, 24, 33, 38, 54, 64-67).  For the scheme to succeed, the Defendants allegedly deceived Mansfield into believing that On-Site was a viable business capable of paying its debts.  (Adv. Dkt. 77 ¶¶ 23, 32-34).

The fraudulent scheme allegedly began moving forward in late 2017 when the Defendants presented Mansfield with certain records and information concerning On-Site's financial performance.  (Adv. Dkt. 77 ¶¶ 22-23).  This presentation, according to Mansfield, falsely represented that On-Site was generating EBITDA averaging approximately $300,000 per month.  (Adv. Dkt. 77 ¶ 22).

Mansfield alleges that Harrison and McGlinn knew this information was materially inaccurate and that On-Site's revenue was in steep decline because of a significant loss of business

at the end of 2017.  (Adv. Dkt. 77 ¶¶ 23-25).  Mansfield claims that the records provided by McGlinn to Mansfield were later restated to reflect negative earnings for 2017.  (Adv. Dkt. 77 ¶ 45).  In an email to McGlinn on December 11, 2017, Harrison commented, "I'll be glad when we can turn that over to Mansfield."  (Adv. Dkt. 77 ¶ 25).  In response to a later email about On-Site's poor performance in November 2017, Harrison's only remark was, "Are we making progress on Mansfield?"  (Adv. Dkt. 77 ¶ 25).

Their fraudulent scheme, according to Mansfield, was almost derailed when PNC Bank informed McGlinn that it would not consent to the alliance with Mansfield unless On-Site paid off its loan.  On-Site, however, lacked the funds to pay-off PNC Bank, and On-Site's majority owners allegedly were unwilling to "push" any more money into On-Site.  To solve this problem, Mansfield alleges that McGlinn asked Mansfield to advance On-Site $4.8 million.  (Adv. Dkt. 77 ¶¶ 31-33).  To allay any concerns about its credit exposure, Mansfield contends that McGlinn gave specific, positive assurances to Byrd about how and when On-Site would repay its debt after the advance.  (Adv. Dkt. 77 ¶¶ 32-33).

On May 1, 2018, McGlinn sent Byrd a message from his Capitala email account.  The signature identifies McGlinn as the "COO-Director" of the Capitala Group in Charlotte, North Carolina.  (Adv. Dkt. 77-2, Ex. 2 at 2).  On-Site's chief executive officer at that time, French, is copied on McGlinn's email, but French did not author or send it.  (Adv. Dkt. 77-2, Ex. 2).  Mansfield points to this email as confirmation that McGlinn was speaking not only for On-Site but also for its majority owners, Harbert and Capitala.  Mansfield alleges that the purpose and intent of this email was to induce Mansfield to make the $4.8 million advance and consummate the alliance with On-Site by misrepresenting that On-Site had specific assets of approximately $6 million of "cash in-flows" designated to repay the debt within a few months.  (Adv. Dkt. 77 ¶¶ 33-

34).  Mansfield, however, claims that the Defendants knew at this time that the "cash in-flows" were doubtful as to amount and collectability and that On-Site was too cash-strapped to use any of its collections to repay Mansfield.  (Adv. Dkt. 77 ¶ 33).

On June 15, 2018, McGlinn sent a follow-up message to Byrd from his Capitala email account.  (Adv. Dkt. 77-5, Ex. 5).  Again, French is copied on this email.  In the email, McGlinn confirmed that the net amount owed by On-Site to Mansfield at that time was approximately $4.7 million and reassured Byrd that On-Site had "about $7MM of working capital items" to repay Mansfield.  (Adv. Dkt. 77-5, Ex. 5).  Mansfield alleges that it continued to extend credit to On-Site in reliance on these false representations and On-Site's debt grew to approximately $6 million.  According to Mansfield, On-Site was in default of its obligation to repay Mansfield as of September 15, 2018.  (Adv. Dkt. 77 ¶ 47).  Also according to Mansfield, no "cash in-flows" or "working capital items" were ever used to repay Mansfield because On-Site used all its collections as "fungible cash" to stay afloat.  (Adv. Dkt. 77 ¶¶ 33, 48, 56).

The Harbert Defendants argue that the above summarized allegations do not suffice to state a claim against them for fraud with sufficient particularity.  The Court previously has found that McGlinn's statements, which are the basis for Mansfield's fraud claim against the Capitala Defendants, were pleaded with sufficient particularity to satisfy Rule 9(b).  The Harbert Defendants contend that the allegations in the Complaint fail to plead with particularity the basis for imputing liability for the Capitala Defendants' alleged fraud.  *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. H-06-1492, 2007 WL 400094, at *4 (S.D. Tex. Feb. 1, 2007) (where plaintiff did not claim that the defendant made any fraudulent statement and instead sought to impute liability, court required the plaintiffs "to plead . . . with the particularity required under Rule 9(b)" facts showing a basis for finding any agency relationship existed).  They contend that

the Fifth Circuit has affirmed a district court's dismissal for failure to state a claim where the plaintiff failed to adequately plead an agency relationship and where the plaintiff's theory of liability against the defendant was vicarious liability. *Christiana Tr. v. Riddle*, 911 F.3d 799, 801 (5th Cir. 2018) (theory of vicarious liability "require[d] pleading facts that suggest an agency relationship"); *see Peter Lik Miami, Inc. v. Comco, LLC*, No. 11-23844-CIV, 2013 WL 12247795, at *3 (S.D. Fla. Oct. 7, 2013) ("Plaintiff fails to adequately plead the existence of an agency relationship between Forever 21 and Fastrack because it offers only one conclusory allegation regarding its agency theory."). The Harbert Defendants examine the sufficiency of the agency allegations against them separately, and so the Court does too.

### (1)    Harbert

The Harbert Defendants point out that out of the nine (9) exhibits attached to the Complaint, only the SAA mentions Harbert, and no employee of Harbert sent or received any of the emails attached by Mansfield to the Complaint in support of its fraud claim. (Adv. Dkt. 77-2, Ex. 2; Adv. Dkt. 77-4 to 77-8, Exs. 4-8). They contend that the Complaint mentions Harbert only with respect to the actions of its alleged agent: "McGlinn acted as an agent for . . . Capitala and Harbert"; "Capitala and Harbert are directly liable for their actions in authorizing, directing, acquiescing in and/or failing to prevent the fraudulent actions of their agents"; "Capitala, Harbert, and Harrison authorized, directed, acquiesced in and/or failed to prevent McGlinn's negligent misrepresentations and are directly liable for the same"; and "Capitala and Harbert are vicariously liable for the actions and omissions of their agents." (Adv. Dkt. 77 ¶¶ 65,67, 70, 72, 73).

In Mississippi, an agent may be an express or apparent agent. "An express agent is one who is 'in fact authorized by the principal to act on their behalf.'" *Forest Hill Nursing Ctr., Inc. v. McFarlan*, 995 So. 2d 775, 781 (Miss. Ct. App. 2008) (quoting *McFarland v. Entergy Miss.,*

*Inc.*, 919 So. 2d 894, 902 (Miss. 2005)).  An apparent agent is one who reasonably appears by third parties to be the authorized agent of the principal.  "A de facto agency may be proven by the presence of three elements at the time of contracting:  "(1) [m]anifestation by the alleged principal, either by words or conduct, that the alleged agent is employed as such by the principal; (2) [t]he agent's acceptance of the arrangement; [and] (3) [t]he parties understood that the principal will control the undertaking."  *Forest Oil Corp. v. Tenneco, Inc.,* 626 F. Supp. 917, 921 (S.D. Miss. 1986).

The Harbert Defendants describe the agency allegations in the Complaint as conclusory: Harbert is an "investment partner" with Capitala, Harbert and Capitala are the "majority owners of On-Site Fuel Holdings, Inc., which in turn owns 100% of On-Site"; "Harrison, as Harbert's agent, approved, directed, acquiesced in or failed to prevent the actions giving rise to Mansfield's claims herein"; "[a]s agents for On-Site's majority owners, McGlinn and Harrison comprised a two (2) member 'Special Committee' which was formed to pursue strategic options of On-Site and specifically a business relationship with Mansfield"; "Capitala and Harbert exercised complete control of On-Site"; "[a]cting on behalf of On-Site, Capitala, and Harbert, McGlinn and Harrison managed and participated in the negotiations with Mansfield"; "McGlinn [the chairman of the board of directors] acted as the agent of Capitala, Harbert and On-Site"; "[a]s Harbert's agent, and a 'Special Committee' member, Harrison was not merely a passive director"; and "McGlinn, acting on behalf of On-Site and its majority owners, solicited Mansfield's financial assistance."  (Adv. Dkt. 77 ¶¶ 14, 15, 18, 20, 22, 25, 31).  The Harbert Defendants contend that the Complaint alleges no facts supporting a finding that Harrison expressly authorized McGlinn to act as his agent and, moreover, that the allegations of a *de facto* agency relationship are insufficient.

The Harbert Defendants argue that there can be no express agency between Harrison and Harbert for vicarious liability because as a director of On-Site, Harrison owed his fiduciary duties to On-Site, not to Harbert, and, therefore, his actions are attributable only to On-Site. The corollary to the general principle of corporate law that a parent is not liable for the acts of its subsidiary is the well-established principle "that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *United States v. Bestfoods*, 524 U.S. 51, 69-70 (1998) (quoting *Lusk*, 129 F.3d at 779). In *Gross v. GGNSC Southaven, LLC*, No. 3:14CV00037-M-A, 2014 WL 4418051, at *4 (N.D. Miss. Sept. 8, 2014), the defendants, non-resident affiliates of an assisted-living facility in Mississippi, moved to dismiss a medical malpractice and wrongful death claim against them for lack of personal jurisdiction. The plaintiff argued that the defendants were involved in a joint venture with the assisted living facility in Mississippi and, therefore, were jointly liable and subject to personal jurisdiction in Mississippi. The district court rejected the plaintiff's argument because of the absence of any facts showing an actual intent by the defendant to form an agreement to operate the assisted-living facility. The district court refused to impute to the defendants "mutual control over their respective subsidiaries merely because the entities allegedly have board members and officers in common with the other defendant. Decisions affecting healthcare operations made by shared corporate officers would be attributable to their role as employees of the healthcare subsidiaries not the parent/holding companies." *Id.* at *4. The evidence showed that the defendants were merely holding companies that performed no independent business other than holding various investments. *Id.* The district court expressed concern that if it found that the defendants had engaged in a joint venture, despite their adherence to corporate formalities, it would thwart legitimate aims of corporate structuring. *Id.*

As to the existence of a *de facto* agency relationship between Harbert and Harrison, the Harbert Defendants assert that Mansfield has not alleged that Harrison or anyone else affiliated with Harbert informed Mansfield that Harrison was acting as its agent.  "An apparent or ostensible agent is one whom the *principal* has intentionally or by want of ordinary care *induced* third parties to believe is his agent, although no authority has been conferred on him either expressly or by implication."  *Cooley v. Brawner*, 881 So. 2d 300, 302 (Miss. Ct. App. 2004) (emphasis added). Because Mississippi agency law looks to the manifestations of the principal, the Harbert Defendants contend that what Harrison may have told Mansfield is irrelevant.

The Complaint alleges that McGlinn was acting as an agent of On-Site, Capitala, and Harbert in dealing with Mansfield.  According to Mansfield, Capitala and Harbert delegated primary authority and executive function to McGlinn concerning the management of On-Site. Mansfield alleges that Harbert is directly liable for its role in the fraudulent scheme because it authorized and/or acquiesced in McGlinn's misrepresentations to further its shared interests in On-Site.  (Adv. Dkt. 77 ¶ 67); *see Gandy v. Palmer*, 169 So. 2d 819, 824 (Miss. 1964) (a principal is liable for the torts of its agent committed against third parties where the principal expressly authorizes or ratifies the unlawful act).  The Court finds that the allegations, if accepted as true, are sufficient to establish Harbert's vicarious liability for Harrison's conduct.  *Id*.; *see Billups Petroleum Co. v. Hardin's Bakeries Corp.*, 63 So. 2d 543, 546 (Miss. 1953) (a principal is liable to third parties for injuries resulting from the deceit of its agent where such conduct occurs within the scope of the agent's authority, even though the principal did not know of or authorize the act and did not benefit from it).

The Harbert Defendants' reliance on *Bestfoods* and *Gross* is misplaced.  The United States Supreme Court in *Bestfoods* did not pronounce a rule, as they suggest, that dual officeholders

always act in their ostensible capacity but expressly recognized that they sometimes depart from their ostensible roles depending on the factual circumstances. *Bestfoods*, 524 U.S. at 71-72. In *Gross*, there was no evidence of a joint venture among the defendants. For these reasons, the Court finds that the agency allegations supporting Mansfield's fraud and negligent misrepresentation claims against Harbert satisfy Rule 9(b).

### (2) Harrison

The Harbert Defendants contend that for Mansfield's claim of fraud against Harrison, Harrison's alleged liability to Mansfield is premised not on Harrison's actions but on McGlinn's. The Harbert Defendants assert that Harrison is mentioned only twice in the specific count allegations in the Complaint. Mansfield alleges that "Harrison, as a member of On-Site's board and the 'Special Committee,' is directly liable for his actions in authorizing, directing, acquiescing in and/or failing to prevent McGlinn's fraudulent acts and omissions" (Adv. Dkt. 77 ¶ 66) and "Capitala and Harbert are directly liable for their actions in authorizing, directing, acquiescing in and/or failing to prevent the fraudulent actions of their agents, McGlinn and Harrison." (Adv. Dkt. 77 ¶ 67). For Mansfield's claim of negligent misrepresentation against Harrison, Mansfield alleges that "Capitala, Harbert, and Harrison authorized, directed, acquiesced in and/or failed to prevent McGlinn's negligent misrepresentations and are directly liable for the same." (Adv. Dkt. 77 ¶ 72).

The allegations in the Complaint, according to the Harbert Defendants, are devoid of any statement attributable to Harrison. Instead, Mansfield alleges that "McGlinn and Harrison had ongoing communications regarding On-Site's dire financial and operation situation while the negotiations with Mansfield were ongoing. Harrison, with full knowledge of On-Site's poor performance, was in lock-step with McGlinn in pushing a deal with Mansfield to relieve Capitala and Harbert of the burden of funding On-Site's failing operations." (Adv. Dkt. 77 ¶ 24). The

Harbert Defendants argue that Harrison is an express agent for Harbert and On-Site but not for the other directors on their boards. As the U.S. Supreme Court has observed, "in the absence of special circumstances, it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents." *Meyer v. Holley*, 537 U.S. 280, 286 (2003) (rejecting holding that the Fair Housing Act made "corporate owners and officers liable for the unlawful acts of a corporate employee simply on the basis that the owner or officer controlled (or had the right to control) the actions of that employee"). The Harbert Defendants argue that because McGlinn is not Harrison's agent, Mansfield has no viable claim against Harrison unless he personally committed a tort against Mansfield or personally acquiesced in a tort by another. They maintain that it is insufficient to rely merely on Harrison's position on the board and the fact that he had some knowledge of the affairs of On-Site in that role. *E.g.,* *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168 (5th Cir. 1985) (refusing to impose personal liability on a corporate officer in a products liability case where he was only peripherally involved in the manufacture of the product and was not "the guiding spirit" or "central figure" in the challenged corporate activity). Applying the rule from *Mozingo*, a Mississippi district court held that where the plaintiff had alleged that a defendant "participated in the steering policy and practice of Allstate" and that "Plaintiff's repair shop [was] one of the repair shops from which Allstate and [the Defendant had] wrongfully diverted business," there was "no factual basis for concluding that [the Defendant] 'directly,' 'personally,' and 'actively' participated" in the alleged tortious conduct. *Addison v. Allstate Ins. Co.*, 58 F. Supp. 2d 729, 733 (S.D. Miss. 1999). The Harbert Defendants argue that Mansfield similarly has not pleaded any factual basis for concluding that Harrison authorized or acquiesced to McGlinn's challenged conduct.

As an example, they cite *Turner v. Wilson*, 620 So. 2d 545, 548 (Miss. 1993), where two farmers sued the individual directors of South Central Mississippi Farmers, Inc. ("SCMF") for wrongful conversion of their soybeans. SCMF's manager sold the farmers' soybeans and used the money to pay SCMF's corporate debts, and there was no money left in the corporate accounts to pay the farmers. *Id*. at 547. After trial, a money judgment was entered against three of the directors. On appeal, the Mississippi Supreme Court held that the evidence was insufficient to show that the directors authorized, directed, or actively participated in the wrongful conversion or that they had knowledge of the conversion amounting to acquiescence. *Id*. at 546. The Harbert Defendants argue that like the farmers in *Turner*, Mansfield cannot prove that Harrison authorized any of McGlinn's alleged fraudulent statements.

As noted in *Turner*, Mississippi follows the general rule of corporate law that "individual liability of corporate officers or directors may not be predicated merely on their connection to the corporation." *Turner,* 620 So. 2d at 548. It is also well established that when a corporate officer or director "directly participates in or authorizes the commission of a tort, even on behalf of the corporation, he may be held personally liable" and that such liability does not require that the "corporate veil" be pierced. *See Hardy v. Brock*, 826 So. 2d 71, 75 (Miss. 2002) (where direct wrongdoing does not exist, veil piercing is required in order to hold an individual agent liable for a corporate debt); *Miss. Printing Co. v. Maris, West & Baker, Inc.*, 492 So. 2d 977, 978 (Miss. 1986); *see also Wilson v. S. Cent. Miss. Farmers, Inc.*, 494 So. 2d 358, 361 (Miss. 1986) ("Any officer or agent of a corporation who actively participates in the commission of a tort is personally liable to third persons injured thereby."). Under the corollary to the general rule, false representations about the financial condition of a corporation made by corporate officers renders those officers "participating in, or consenting to, the fraud liable to persons who are injured by

reliance on the representations."   3A FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 1146 (2019); *see Whitaker v. Limeco Corp.*, 32 So. 3d 429, 437 (Miss. 2010) (holding that the plaintiff stated a viable fraud claim against an agent who falsely portrayed the company's financial condition and ability to repay a debt).   Tort liability in Mississippi extends to any corporate officer, director, or agent who:

> has participated in the tortious act, or has authorized or directed it, or has acted in his own behalf, or has had any knowledge of, or given any consent to, the act or transaction, *or has acquiesced in it when he either knew or by the exercise of reasonable care should have known of it and should have objected and taken steps to prevent it.*

*Aldridge v. Aldridge*, 168 So. 3d 1127, 1141 (Miss. Ct. App. 2014) (citing 19 C.J.S. *Corporations* § 544 (1990) (emphasis added)).   In *Aldridge*, a father formed a nonprofit corporation and named his son as its chief executive officer.   The father embezzled funds from his sister-in-law and laundered some of the money through the nonprofit corporation.   *Aldridge*, 168 So. 3d at 1130-31. The sister-in-law sued the father, son, and the nonprofit corporation for fraud, embezzlement, and unjust enrichment.   At trial, the court awarded the sister-in-law a monetary judgment against all defendants.   On appeal, the son argued that the trial court erred in holding him liable because there was no evidence showing that he actively participated in the wrongful taking of his aunt's money. *Id*. at 1137-38.   The Mississippi Supreme Court affirmed, holding that as a corporate officer, the son could not turn a blind eye to the wrongful acts committed by his father.   By failing to investigate and take steps to prevent harm to his aunt, the son had "acquiesced" in his father's fraudulent scheme and thus was personally liable for the torts of the nonprofit corporation.   *Id*. (applying the rule in *Turner*, 620 So. 2d at 548-49).

The question raised by the Harbert Defendants is whether Harrison's alleged participation and/or acquiescence is sufficient to impose personal liability on him.   The Complaint alleges

Harrison's position of authority, the attendant duties he held, and his responsibilities with respect to the affairs of On-Site and its dealings with Mansfield. Harrison had knowledge of the financial affairs of On-Site and was involved in On-Site's pursuit of Mansfield as part of the "Special Committee." In an email to McGlinn on December 11, 2017, Harrison commented, "I'll be glad when we can turn that over to Mansfield." (Adv. Dkt. 77 ¶ 25). In response to a later email about On-Site's poor performance in November 2017, Harrison's only remark was, "Are we making progress on Mansfield?" (Adv. Dkt. 77 ¶ 25). The Court finds that the allegations in the Complaint, which must be taken as true, sufficiently demonstrate that Harrison either authorized McGlinn's conduct for Harbert's benefit or acquiesced in it by turning a blind eye.

### (3)   Summary—Fraud and Negligent Misrepresentations

The allegations of fraud and negligent misrepresentations against the Harbert Defendants, including the agency allegations, are sufficiently pleaded to satisfy the requirements of Rule 9(b). For that reason, the Harbert Defendants are not entitled to a judgment on the pleadings with respect to these claims.

### b.   Tortious Interference with Contract

For the claim of tortious interference with contract, Mansfield alleges that "[b]y authorizing, directing, acquiescing in or failing to prevent the 'fire sale' of On-Site's assets to Diesel Direct without Mansfield's consent, all Defendants blatantly disregarded and tortiously interfered with Mansfield's contractual rights under the SAA." (Adv. Dkt. 77 ¶ 76). The Harbert Defendants argue that Mansfield failed to identify any facts indicating how Harrison authorized or directed the "fire sale."

As a member of the Special Committee charged with securing the alliance memorialized by the SAA, Harrison had knowledge of On-Site's obligations and Mansfield's contractual rights

under the SAA.  While McGlinn may have initiated the "fire sale" process by shutting down On-Site's business, the sale could not move forward without the consent of the majority owners under Mississippi law.  MISS. CODE ANN. § 79-4-12.02 (requiring board and shareholder approval of a sale of substantially all company assets); *see also Rex*, 271 So. 3d at 453 (plaintiff stated a claim for tortious interference based on concerted activity where one defendant perpetrated the interfering acts but could not have accomplished the objective without the co-defendant's participation).  Even if the Harbert Defendants were unaware of the "fire sale," they could still be liable under *Aldridge* for failing to prevent their co-owner and co-director from tortiously interfering with Mansfield's contractual rights.  *See Caldwell*, 12 F. Supp. 3d at 915-16 (complaint sufficiently stated claim for relief where plaintiff alleged that manager and controlling interest holder directed, consented to and acquiesced in the commission of tortious acts, including tortious breach of contract).  For these reasons, the Court finds that the Harbert Defendants are not entitled to a judgment on the pleadings as to Mansfield's tortious interference with contract claim.

### c.      Aiding and Abetting Breach of Duty

Mansfield alleges that the Harbert Defendants are liable for aiding and abetting On-Site in breaching the duty of good faith and fair dealing by "among other things, abusing the strategic alliance relationship, and misappropriating Mansfield's money in order to fund operations and purchase equipment."  (Adv. Dkt. 77 ¶ 80).  The Harbert Defendants contend that there is no Mississippi civil claim known as "aiding and abetting."  Even if there were such a claim, they contend there are no facts alleged indicating how they allegedly assisted or encouraged On-Site to breach its duty.  The Court has ruled previously that in the absence of any direct pronouncement by Mississippi courts recognizing aiding and abetting as a cause of action, no such claim exists in

Mississippi.[28]  Accordingly, the Harbert Defendants are entitled to a judgment on the pleadings as to Mansfield's aiding and abetting breach of duty claim.

### d.      Civil Conspiracy

For the claim of civil conspiracy, Mansfield alleges that "Capitala and Harbert conspired with one another and with On-Site to induce Mansfield to enter into a strategic alliance relationship and extend credit which On-Site had no ability of repaying.  Capitala and Harbert also conspired with one another and with On-Site to hinder payment of the debt owed to Mansfield by selling On-Site's assets at a 'fire sale' and dissipating its available resources, including the Earmarked Assets."  (Adv. Dkt. ¶ 83).  The Harbert Defendants contend that these allegations cannot be distinguished from those allegations rejected by the U.S. Supreme Court as insufficient in *Twombly*.

In *Twombly*, the plaintiffs, representing a class of subscribers of local telephone and internet services, alleged that the major telecommunications companies had conspired to inhibit the growth of new, smaller telephone companies in their respective territories and had conspired not to compete with one another in violation of the Sherman Act, 15 U.S.C. § 1.  *Twombly*, 550 U.S. at 550.  Before 1984, the AT&T Corporation was the sole provider of telephone services throughout most of the United States.  After the divestiture in 1984, Regional Bell Operating Companies, known as "Baby Bells," provided local telephone services, and the AT&T Corporation provided long-distance services as a separate market from which the Baby Bells were excluded. In 1996, Congress withdrew approval of the monopolies and allowed the Baby Bells to enter the long-distance market once certain conditions were met.  47 U.S.C. § 271.  Central to the 1996

---

[28] *See supra* pp. 53-57.

legislation was the obligation of the Baby Bells to share their network with competitors at low, cost-based rates.

At issue in *Twombly* was whether the challenged anti-competitive conduct by the Baby Bells stemmed from an agreement. To show the existence of such an agreement, the plaintiffs alleged the "absence of any meaningful competition between [the Baby Bells] in one another's markets;" "the parallel course of conduct that each [Baby Bell] engaged in to prevent competition," and that the "[Baby Bells] had entered into a contract, combination, or conspiracy to prevent competitive entry . . , and ha[d] agreed not to compete with each other." *Twombly*, 550 U.S. at 565. The U.S. Supreme Court concluded that these allegations were insufficient to state a claim for conspiracy. "[T]he pleadings mentioned no specific time, place, or person involved in the alleged conspiracies." *Id*. at 565 n.10. Although the allegations of lawful parallel conduct were consistent with a conspiracy, they did not exclude the possibility that the "Baby Bells" had acted independently. *Id.* at 554. Indeed, the Supreme Court noted that there was no need for any joint agreement because an incentive for the "Baby Bells" to avoid dealing with local competitors already existed. For that reason, the allegations of parallel conduct did not create a plausible inference of an agreement.

The Court finds *Twombly* factually distinguishable. The plaintiffs in *Twombly* failed to place their allegations of parallel conduct in a context that suggested a preceding agreement among the alleged conspirators. Here, Mansfield alleges that the conduct could not have occurred but for an agreement. These allegations support an inference that the Defendants shared a unity of purpose and that they combined their efforts through the formation of a Special Committee to achieve an alliance with Mansfield. (Adv. Dkt. 77 ¶¶ 14, 15, 17, 24, 25, 33); *see Mack*, 737 F.2d at 1351 (civil conspiracy claim requires meeting of the minds between co-conspirators). According to

Mansfield, the Defendants achieved this purpose through unlawful means—by making fraudulent misrepresentations about On-Site's viability and ability to repay debt.   Mansfield alleges that McGlinn's false assurances to Byrd constituted overt acts in furtherance of the conspiracy and implicate all Defendants in the scheme.  *See Bradley*, 117 So. 3d at 339-40 (single conspirator committed act in furtherance); *Rex,* 271 So. 3d at 454.   The Court finds that the Complaint plausibly infers a conspiracy, "not merely parallel conduct that could just as well be independent action," and "raise[s] a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556-57.

### e.      Statutory Claim

For the statutory claim under NC UDTPA, the Harbert Defendants argue that Mansfield fails to allege how and why a North Carolina statute applies to Harbert, a Delaware corporation (Adv. Dkt. 77 ¶ 7) or to Harrison, a resident of Tennessee (Adv. Dkt. 77 ¶ 8).   As discussed previously, the place of conduct causing Mansfield's alleged injury is North Carolina where Capitala and Harbert exercised control of On-Site's business through their joint venture.[29]   *See Bybee*, 817 S.E.2d at 497.   The Harbert Defendants dispute the existence of a joint venture by pointing to the Stockholders Agreement, which the Court declines to consider for purposes of its Rule 12(c) analysis.[30]   For the reasons set forth in detail previously, the Court finds that Mansfield has stated an adequate claim against the Harbert Defendants for violations of the NC UDTPA.[31]

---

[29] *See supra* pp. 58-68.

[30] *See supra* pp. 70-71.

[31] *See supra* pp. 58-68.

### 6. Summary—Rule 12(c)

The Court finds that the allegations in the Complaint contain sufficient facts which if accepted as true, state plausible claims against the Harbert Defendants for fraud, negligent misrepresentations, tortious inference with contract, civil conspiracy, and violations of the NC UDTPA. Because the allegations for aiding and abetting breach of duty do not state a plausible claim for relief, the Harbert Defendants are entitled to a judgment on the pleadings as to that claim.

## B. Summary—Harbert Motion

Because On-Site is not a required party under Rule 19(a), the relief requested in the Harbert Motion under Rule 12(b)(7) should be denied. The Court finds that the claims against the Harbert Defendants for fraud, negligent misrepresentations, tortious interference with contract, conspiracy, and violations of the NC UDTPA are plausible and that the relief requested in the Harbert Motion under Rule 12(c) as to these claims should be denied. The Court further finds that the remaining claim of aiding and abetting breach of duty against the Harbert Defendants fails to state a claim for relief and that the Harbert Defendants are entitled to a judgment on the pleadings as to this claim.

## CONCLUSION

The Court has considered all of the arguments raised by the Defendants. Any argument not specifically addressed in this Opinion would not have changed the outcome. For all the above and foregoing reasons, the Court finds that the Capitala Motion should be granted in part and denied in part. The Capitala Motion should be granted in part, and Mansfield's claim for aiding and abetting a breach of duty should be dismissed for failure to state a claim for relief. As to all other relief, the Capitala Motion should be denied. The Harbert Motion should be granted in part and denied in part. The Harbert Defendants are entitled to a judgment on the pleadings as to

Mansfield's claim for aiding and abetting a breach of duty.  As to all other relief, the Harbert Motion should be denied.

IT IS, THEREFORE, ORDERED that the Capitala Motion is hereby granted in part and denied in part.  The Capitala Motion is hereby granted in part and Mansfield's claim for aiding and abetting a breach of duty against the Capitala Defendants is hereby dismissed for failure to state a claim for relief.  As to all other relief, the Capitala Motion is hereby denied.

IT IS FURTHER ORDERED that the Harbert Motion is granted in part and denied in part.  The Harbert Defendants are awarded a judgment on the pleadings as to Mansfield's claim for aiding and abetting a breach of duty.  As to all other relief, the Harbert Motion is hereby denied.

IT IS FURTHER ORDERED that the Capitala Defendants shall file an answer to the Complaint within fourteen (14) days of the date of this Opinion.

##END OF OPINION##